Harvey I. Saferstein (SBN: 49750)
Nada I. Shamonki (SBN: 205359)
MINTZ LEVIN COHN FERRIS GLOVSKY AND
  POPEO P.C.
Century Plaza Towers
2029 Century Park East, Suite 1370
Los Angeles, CA 90067
Telephone:  (310) 586-3200
Fax:  (310) 586-3202
Email:  hsaferstein@mintz.com; nshamonki@mintz.com

Michael P. Cillo, Esq. (*Pro Hac Vice Application Pending*)
Melissa J. Hessler, Esq. (*Pro Hac Vice Application Pending*)
DAVIS & CERIANI, P.C.
1350 17th Street, Suite 400
Denver, Colorado 80202
Telephone:  (303) 534-9000
Fax:  (303) 534-4618
Email:  mcillo@davisandceriani.com; mhessler@davisandceriani.com

Attorneys for Counterclaim Plaintiffs
Nuveen Municipal High Income Opportunity Fund,
the Nuveen Municipal Trust on behalf of its series
Nuveen High Yield Municipal Bond Trust, and
Pacific Specialty Insurance Co.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| CITY OF ALAMEDA, CALIFORNIA, on behalf of itself and ALAMEDA POWER & TELECOM, a department of the City of Alameda; ALAMEDA PUBLIC FINANCING AUTHORITY; and ALAMEDA PUBLIC IMPROVEMENT CORPORATION,<br><br>            Plaintiffs,<br><br>      vs.<br><br>NUVEEN MUNICIPAL HIGH INCOME OPPORTUNITY FUND; THE NUVEEN MUNICIPAL TRUST; and NUVEEN ASSET MANAGEMENT, INC.,<br><br>            Defendants.<br>―――――――――――――――――――――<br>NUVEEN MUNICIPAL HIGH INCOME OPPORTUNITY FUND, a Massachusetts business trust; THE NUVEEN MUNICIPAL TRUST on behalf of its series NUVEEN HIGH | Case No. C 08-04575 SI<br><br>[Complaint filed October 1, 2008]<br><br>Case assigned to the Honorable Susan Illston<br><br>**COUNTERCLAIM**<br><br>**DEMAND FOR JURY TRIAL** |

1

1    YIELD MUNICIPAL BOND FUND, a
     Massachusetts business trust, and PACIFIC          )
2    SPECIALTY INSURANCE COMPANY, a                      )
     California Insurance Company,                       )
                                                         )
3                    Counterclaim Plaintiffs,            )
                                                         )
4         vs.                                            )
                                                         )
5    CITY OF ALAMEDA CALIFORNIA;                         )
     ALAMEDA POWER & TELECOM, a                          )
6    department of the City of Alameda;                  )
     ALAMEDA PUBLIC FINANCING                            )
7    AUTHORITY, an unregistered California               )
     corporation; ALAMEDA PUBLIC                         )
8    IMPROVEMENT CORPORATION, a                          )
     California non-profit public benefit corporation; )
9    STONE & YOUNGBERG, LLC, a California                )
     limited liability company; and UPTOWN              )
10   SERVICES, INC., a private corporation f/k/a         )
     Uptown Services, LLC,                               )
11                                                       )
                     Counterclaim Defendants.            )
12                                                       )
                                                         )
13   ─────────────────────────────────────────────

14        Pursuant to Fed. R. Civ. P. 13(h), 19 and 20, Counterclaim Plaintiffs Nuveen Municipal High

15   Income Opportunity Fund, the Nuveen Municipal Trust on behalf of its series Nuveen High Yield

16   Municipal Bond Fund and Pacific Specialty Insurance Company (collectively the "Nuveen Funds and

17   Pacific") for their Counterclaim against Counterclaim Defendants City of Alameda, Alameda Power &

18   Telecom, Alameda Public Financing Authority, Alameda Public Improvement Corporation, Stone &

19   Youngberg, LLC and Uptown Services, LLC, state as follows:

20                              **JURISDICTION AND VENUE**

21        1.    This Court has federal question jurisdiction pursuant to the Securities Exchange Act of

22   1934, 15 U.S.C. § 78aa and 28 U.S.C. § 1331.  This Court has jurisdiction to hear and determine the

23   Nuveen Funds' and Pacific's pendent claims for relief arising under the state securities acts of

24   California and Illinois, for common law fraud, aiding and abetting common law fraud, negligent

25   misrepresentation and breach of contract in that such claims arise from a common nucleus of operative

26   facts and are so intertwined as to make the Court's exercise of jurisdiction appropriate.  This Court

27   also has supplemental jurisdiction over the counterclaims alleged herein pursuant to 28 U.S.C. § 1367.

28                                              2

                                    COUNTERCLAIM; DEMAND FOR JURY TRIAL
                                    Case No. C 08-04575 SI

2.      Venue of this action lies in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the Nuveen Funds' and Pacific's claims occurred in this District, and the property that is the subject of this action is located in this District.

## INTRADISTRICT ASSIGNMENT

3.      On July 30, 2008 Vectren Communication Services ("Vectren") filed a Complaint for Breach of Contract ("Vectren Complaint") against the City of Alameda, acting by and through Alameda Power & Telecom in the Northern District of California (Case No. C 08 3137 SI) which case was assigned to the Honorable Susan Illston.

4.      On October 1, 2008 the City of Alameda, California, Alameda Power & Telecom, Alameda Public Financing Authority, and Alameda Public Improvement Corporation (collectively "the City") filed a declaratory judgment complaint ("City Complaint") (Case No. C 08 4575 JCS) which was assigned to the Honorable Magistrate Judge Joseph C. Spero.

5.      On October 8, 2008 the City filed an Administrative Motion to Consider whether the cases should be related within the meaning of Local Rule 3-12 wherein the City alleged that the City Complaint and Vectren Complaint are related cases.

6.      On October 15, 2008 Honorable Susan Illston found Case No. C 08 04575 JCS and Case No. C 08 03137 SI to be related and assigned both cases to her docket.

7.      The Nuveen Funds' and Pacific's counterclaims arise out of the same nexus of facts and legal claims and therefore assignment to Honorable Susan Illston's division is appropriate pursuant to Civil L.R. 3-2(c).

## SUMMARY OF COUNTERCLAIM

8.      Alameda Power & Telecom ("AP&T") is a division of the City of Alameda, California (the "City") which, acting through the Alameda Public Financing Authority (the "Authority") (another entity controlled by the City of Alameda) and in conjunction with Alameda Public Improvement Corporation ("APIC") (another entity controlled by the City) ( collectively hereinafter "the Alameda Defendants"), issued $33,000,000 in face value of municipal revenue Bond Anticipation Notes (the "Notes") in May 2004 to: finance the completion of a citywide hybrid fiber-coaxial telecom system

1  (the "Telecom System"); repay about $16,000,000 in outstanding debt for construction of the Telecom

2  System which was due to be repaid in May 2004; provide funds for the payment of capitalized interest

3  on the Notes through their maturity in 2009; and pay certain costs of issuance of the Notes.

4      9.    The principal source of funds to repay the Notes in 2009 was to be the sale of long

5  term municipal revenue bonds.  The Notes were also secured by a pledge of Net Revenues (as defined

6  in the underlying documents) from the operation of the Telecom System beginning in April 2009 in

7  the event the Notes were not repaid through the issuance of long term municipal revenue bonds.

8      10.   The City caused the Authority to hire Stone & Youngberg LLC ("Stone &

9  Youngberg") to act as the underwriter for the Notes.  As the underwriter of the Notes, Stone &

10  Youngberg was primarily responsible for drafting the Preliminary Official Statement ("POS") and the

11  Official Statement ("OS") (collectively the "Official Statements") which were the principal disclosure

12  documents used by Alameda and Stone & Youngberg to market and sell the Notes to members of the

13  investing public, including Plaintiffs.

14     11.   The City hired Uptown Services LLC ("Uptown") to prepare a financial feasibility

15  analysis of the Telecom System that was called a "Validation of Cable System Business Plan for

16  Alameda Power & Telecom, Task 1 Report and a Validation of Cable System Business Plan for

17  Alameda Power & Telecom, Task 2 Report" which were attached as appendices to the Official

18  Statements (collectively the "Feasibility Study").

19     12.   Nuveen Municipal High Income Opportunity Fund and the Nuveen Municipal Trust on

20  behalf of its series the Nuveen High Yield Municipal Bond Fund are collectively referred to as the

21  "Nuveen Funds."  Nuveen Asset Management Inc. ("NAM") (which is not a party to the

22  Counterclaim) was the investment advisor to Pacific Specialty Insurance Company ("Pacific") and the

23  Nuveen Funds.  NAM has no right, title or interest in the Notes.  The Nuveen Funds and Pacific

24  collectively purchased $20.5 million of the Notes which form the basis for this civil action from Stone

25  & Youngberg in reliance upon the disclosure contained in the Official Statements, Financial

26  Statements and the Feasibility Study.

27

28

4

13.     As alleged in more detail below, the Official Statements and Feasibility Study contain false and misleading statements of material fact and failures to disclose material fact relating to the City's knowledge as of April 2004 that:

a.     Further operation of the Telecom System by the City was not economically feasible;

b.     The City never intended to operate the Telecom System for a return on investment and always intended to provide artificially low rates to its citizens;

c.     The Telecom System could not compete with Comcast and satellite-based services on a long term basis;

d.     The Telecom System could not compete against competitors poised to offer voice services which would result in a "triple-play" bundled service; and

e.     AP&T had already refused to raise telecom rates despite increasing operating and programming costs.

14.     The approximately $16 million in debt the City incurred in 2000 to install the Telecom System was due to be repaid in May 2004 and the City was very concerned that, if the debt was not repaid through the issuance of the Notes, the lender, Citibank, would take the incomplete system with its relatively few customers, sell it for much less than a completed system with more customers would be worth, and apply the proceeds to reduce the debt.

15.     The Alameda Defendants were also very concerned that if the incomplete system was sold before it was completed and before a larger customer base could be established, Citibank would be able to access the assets of the Electric Division of AP&T to satisfy the remainder of the debt.

16.     By early 2004, the Alameda Defendants believed the Telecom System would be sold after it was completed and not operated as a business.

17.     The Alameda Defendants wanted to prevent creditors of the Telecom System from ever being able to access the assets of the Electric Division and believed that the Telecom System would be more valuable when it was sold if it was first completed and substantially more customers were signed up.

5

COUNTERCLAIM; DEMAND FOR JURY TRIAL
Case No. C 08-04575 SI

18.     The Alameda Defendants decided to issue the Notes to shift much of the risk of completing the System and operating it until it could be sold to purchasers of the Notes.  The City, together with Stone & Youngberg and Uptown, decided to issue the Notes through the Authority pursuant to the false and misleading disclosures contained in the Official Statements and Feasibility Study.

19.     In early 2008 the Alameda Defendants announced the Telecom System was not economically feasible and would have to sold.  The Alameda Defendants have informed Note holders that the sale of the Telecom System will net up to $15 million, which would result in about a $18 million loss to the Note holders.

### PARTIES

20.     Nuveen Municipal High Income Opportunity Fund is a Massachusetts business trust and municipal bond mutual fund that maintained its principal place of business in Illinois at all times pertinent to this Counterclaim, and, as alleged in more detail below, purchased Notes which form the basis for this civil action from Stone & Youngberg.

21.     Nuveen High Yield Municipal Bond Fund is a series of the Nuveen Municipal Trust which is a Massachusetts business trust and is municipal bond mutual fund that maintained its principal place of business in Illinois at all times pertinent to this Counterclaim, and as alleged in more detail below, purchased Notes which form the basis for this civil action from Stone & Youngberg.

22.     Pacific Specialty Insurance Company is a California insurance company which, at all times pertinent to this Counterclaim, maintained its principal place of business in California and as alleged in more detail below, purchased Notes which form the basis for this civil action from Stone & Youngberg.  Pacific is joined to this action as a counterclaim plaintiff pursuant to Fed. R. Civ. P. 13(h), 19 and 20.

23.     The Nuveen Funds and Pacific purchased the Notes as follows:

COUNTERCLAIM; DEMAND FOR JURY TRIAL
Case No. C 08-04575 SI

| | Par Amount | Trade Date | Settle Date | Purchase Price |
|---|---|---|---|---|
| Nuveen High Yield Muni Bond Fund | 10,250,000 | 4/08/2004 | 4/21/2004 | 98.937 |
| | 750,000 | 6/02/2004 | 6/07/2004 | 97.950 |
| | 250,000 | 6/16/2004 | 6/21/2004 | 98.970 |
| | 750,000 | 9/15/2005 | 9/20/2005 | 100.000 |
| | 250,000 | 9/19/2005 | 9/01/2005 | 100.000 |
| | 12,250,000 | | | |
| Nuveen Municipal High Income Opportunity Fund | 7,250,000 | 4/08/2004 | 4/21/2004 | 98.937 |
| | 200,000 | 6/02/2004 | 6/07/2004 | 97.950 |
| | 550,000 | 6/16/2004 | 6/21/2004 | 98.970 |
| | 8,000,000 | | | |
| Pacific Specialty Insurance Company | 250,000 | 4/08/2004 | 4/21/2004 | 98.937 |
| | 50,000 | 6/02/2004 | 6/07/2004 | 97.950 |
| | 300,000 | | | |
| TOTAL | 20,550,000 | | | |

24.     City of Alameda ("City"), is a charter city under the California Constitution. As alleged in more detail below, the City of Alameda caused the Alameda Public Financing Authority to issue the Notes as part of the initial public distribution of the Notes and made the false and misleading statements contained in the Official Statements and knew the Feasibility Study was false and misleading.

7

25.     Alameda Power & Telcom ("AP&T") is a department of the City that was, at all times pertinent to the claims asserted herein, controlled by the City and has, for many years, served as an electric utility provider.  Beginning in 2000, AP&T also became a provider of telecommunication services through the Telecom System.  The two divisions of AP&T are referred to as the "Electric Division" and "Telecom System."  AP&T made the false and misleading statements contained in the Official Statements and knew the Feasibility Study contained false and misleading statements.

26.     Alameda Public Financing Authority (the "Authority") is a public corporation and City instrumentality created to aid the City in the performance of its fiscal duties that was empowered by the City to raise capital and issue the Notes.  The board of directors of the Authority was the Alameda City Council.  The City directly and indirectly controlled the Authority at all times pertinent to this Counterclaim.  As the issuer of the Notes, the Authority made the false and misleading statements contained in the Official Statements and knew the Feasibility Study contained false and misleading statements.

27.     Alameda Public Improvement Corporation ("APIC") is a nonprofit public benefit corporation subject to the direction of the Mayor and the members of the Alameda City Council ("City Council") (who also serve as the board of APIC) that entered into the Installment Sale Agreement with respect to the issuance of the Notes.  APIC made the false and misleading statements contained in the Official Statements and knew the Feasibility Study contained false and misleading statements.

28.     All of the actions and representations of AP&T, the Authority and APIC alleged throughout this Counterclaim were directed, authorized and approved by the City acting through its Mayor and City Council.  Any of such actions that were not directed, authorized and approved by the City were ratified by the City.

29.     Stone & Youngberg, LLC ("Stone & Youngberg") is a California limited liability company and registered broker-dealer that, at all times pertinent to this Counterclaim, maintained its principal place of business in California.  As the underwriter of the Notes, Stone & Youngberg was the principal author of the Official Statements, purchased the Notes from the Authority and offered and sold the Notes to the Plaintiffs.  Stone & Youngberg made the false and misleading representations of

material fact contained in the Official Statements and knew the Feasibility Study was false and misleading.  Stone & Youngberg is joined in this action as a counterclaim defendant pursuant to Fed. R. Civ. P. 13(h), 19 and 20.

30.     Uptown Services, Inc. ("Uptown") is a Colorado corporation and telecommunications consultant that, at all times pertinent to this Counterclaim, maintained its principal place of business in Colorado.  Uptown prepared the Feasibility Study which was attached to the Official Statements and made the false and misleading representations of material fact contained in the Feasibility Study. Uptown is joined in this action as a counterclaim defendant pursuant to Fed. R. Civ. P. 13(h), 19 and 20.

## GENERAL ALLEGATIONS APPLICABLE TO ALL CLAIMS FOR RELIEF

### Alameda Voters Approved the Telecom System in 1998

31.     In 1998, Alameda voters approved the creation of a cable television division within AP&T and, within a year, the City began laying fiber-optic cable for the Telecom System.

32.     At or about the time Alameda voters approved the creation of the Telecom System, the City Treasurer, Kevin Kennedy, told the Alameda Defendants that the Telecom System was not economically feasible with words to the effect that, "the System would never be able to recover the infrastructure costs it paid, even if it signed up every cable subscriber on the island."

### Alameda Borrowed $16 Million and Partnered with Vectren to Install and Manage the Telecom System

33.     In June 1999, AP&T contracted with Vectren Communication Services, Inc., ("Vectren") for the installation and management of the Telecom System.

34.     AP&T financed construction of the Telecom System in December 2000 by issuing $16 million of Series 2000B Certificates of Participation ("2000B COPs") that were purchased by Citibank.

COUNTERCLAIM; DEMAND FOR JURY TRIAL
Case No. C 08-04575 SI

35.     The 2000B COPs were due to be repaid in May 2004 and were secured by the Telecom System to the extent that Citibank could take the Telecom System, sell it and use the proceeds to repay the 2000B COPs in the event the City was unable to otherwise repay the debt.

36.     A Security Agreement was entered into between Alameda Public Improvement Corporation, Alameda Power & Telecom "being the City of Alameda, acting by and through its Bureau of Electricity" and State Street Bank and Trust Company of California as trustee for the benefit of the 2000B COP holder.

37.     The Security Agreement gave the 2000B COP holder collateral in the form of a continuing lien on and security interest in and to all right, title and interest of AP&T to include AP&T's accounts, general intangibles, equipment, fixtures, deposit accounts, chattel paper, documents, instruments, and all property to include proceeds of all or any of the property.


**Alameda Bought Out Vectren's Interest in the Telecom System in 2002**

38.     In early 2002 AP&T and Vectren entered into a contract amendment (the "Vectren Agreement") which resulted in AP&T assuming total responsibility for the completion, management and operation of the Telecom System.

39.     The Vectren Agreement required AP&T to complete the Telecom System.

40.     AP&T bought out Vectren's rights for $6.3 million plus interest that was to be repaid in installments payable from net revenues of the Telecom System by issuing Series 2002A Certificates of Participation ("2002A COPs").

41.     The 2002A COPs gave Vectren a senior lien on Telecom System net revenues until April 2009.

42.     The Alameda Defendants, acting through AP&T, assumed total responsibility for the installation, completion and management of the Telecom System in about February 2002.

///

///

///

**The Alameda Defendants Decided to Issue the Notes to Repay the $16 Million 2000B COPs and Raise Additional Funds to Complete the Telecom System**

43.     As of the end of 2003, the $16 million raised through issuance of the 2000B COPs and other funds advanced to the Telecom System had been fully expended and installation of the Telecom System was not yet complete.

44.     As alleged in more detail below, the 2000B COPs were due to be repaid in May 2004 and the Alameda Defendants were concerned that the holder of the 2000B COPs would take the incomplete system with its relatively few customers, sell it and apply the proceeds to reduce the balance due on the 2000B COPs.

45.     The Alameda Defendants were also concerned that the holder of the 2000B COPs would access the assets of the Electric Division of AP&T to pay off the balance of the COPs.

46.     In early 2004, the Alameda Defendants, acting at the direction of the City, decided to cause the Authority to issue the Notes in the face amount of $33 million to repay the $16 million 2000B COPs, raise additional funds for the completion of the Telecom System, provide sufficient additional funds to pay the purchasers of the Notes capitalized interest until April 2009 and pay other costs and expenses associated with the issuance of the Notes.

**The City Hired Stone & Youngberg to Underwrite the Notes and Uptown to Prepare the Feasibility Study**

47.     The Authority hired Stone & Youngberg to act as underwriter for the Notes.

48.     As the underwriter, Stone & Youngberg purchased the Notes from the City in April 2004 as part of the initial public distribution of the Notes and sold them to the investing public, including the Nuveen Funds and Pacific, pursuant to the disclosure contained in the POS and OS.

49.     As the underwriter, offeror and seller of the Notes, Stone & Youngberg owed a duty to potential purchasers of the Notes, including the Nuveen Funds and Pacific, to have a reasonable basis for believing in the accuracy of the key representations of the issuer (the Authority) and, based upon that belief, to make full, fair and accurate disclosure in the Official Statements of all material facts potential purchasers of the Notes needed to make a fully informed investment decision.

50.     Underwriters like Stone & Youngberg form a reasonable basis for believing in the key representations of the issuer and determine the material facts that must be disclosed in Official Statements by conducting a due diligence investigation into the facts and circumstances surrounding the issuance of the security.

51.     The City, in 2003, hired Uptown to prepare the Feasibility Study that was attached as an appendix to the Official Statements.  Uptown understood the Feasibility Study would be an appendix to the Official Statements and knew investors would rely upon it when making investment decisions.

52.     As an experienced telecommunications industry consultant, Uptown knew the Feasibility Study would likely cause a reasonable investor to conclude Uptown had thoroughly evaluated the reasonableness of the assumptions underlying the projections in the Feasibility Study based upon the operating history of the Telecom System and the historic performance of municipally owned telecommunications systems in the marketplace and had concluded the assumptions (as qualified by Uptown) were reasonable.

53.     As an experienced telecommunications industry consultant, Uptown knew that the Feasibility Study would likely cause a reasonable investor to conclude the Telecom System was economically feasible and worthy of being financed through a purchase of the Notes.

54.     The City, as the entity which controlled the Authority, AP&T and APIC knew that all of the statements contained in the Official Statements and Feasibility Study were, ultimately, representations of the City, AP&T, the Authority and APIC, and knew that it had a duty, independent of Stone & Youngberg and Uptown, to make full and fair disclosure of all material facts.

55.     Uptown, as an experienced telecommunications consultant, Stone & Youngberg, as an experienced underwriter, and the Alameda Defendants, as the operator of the Telecom System, knew that reasonable investors would likely conclude based upon a review of the Official Statements and the Feasibility Study that AP&T could reasonably be expected to operate the System in substantial conformance with the Feasibility Study.

COUNTERCLAIM; DEMAND FOR JURY TRIAL
Case No. C 08-04575 SI

56.     The Alameda Defendants, Stone & Youngberg and Uptown knew that any facts that would indicate to a potential Note purchaser that the assumptions in the Feasibility Study were unreasonable or that AP&T could not operate the Telecom System in substantial conformance with the Feasibility Study would be material and must be disclosed.

57.     The Alameda Defendants, Stone & Youngberg and Uptown identified the key representations of the Authority and knew that they formed the basis for issuing the Notes and creating Official Statements and a Feasibility Study that would make it appear that the Telecom System was worthy of being financed through issuance of the Notes.

58.     Among the key representations of the Authority that were identified by the Alameda Defendants, Stone & Youngberg and Uptown were the following:

   a.     The Telecom System as it existed in April 2004 was economically feasible and had a reasonable probability of being able to achieve a profit by 2007 and repay the Notes in 2009 through the issuance of long term notes;

   b.     AP&T reasonably anticipated it would be able to raise rates to Telecom System customers to the extent projected by Uptown in the Feasibility Study;

   c.     Programming costs could reasonably be expected to increase at the rates projected in the Feasibility Study and to decrease as a percentage of total revenue as projected in the Feasibility Study;

   d.     The Telecom System could reasonably be expected to compete with Comcast and other service providers on a long term basis;

   e.     The Telecom System could compete with Comcast and other providers without offering voice (i.e. telephone) service;

   f.     Multiple dwelling units ("MDUs") were not a material component of the market; and

   g.     Satellite-based systems were not a material threat to the economic feasibility of the Telecom System.

**The Alameda Defendants Knew the Telecom System Was Not Economically Feasible But Nonetheless Caused the Authority to Issue False and Misleading Official Statements**

59.     The City Council met on October 21, 2003 to discuss a $7 million loan from the City's General Fund to AP&T and discussed the following material facts:

a.     AP&T, when it first presented its "business plan" to the City and voters in 1997, projected profits of $883,000 from 7,875 subscribers in 2002 and $1.1 million in profits from 8,265 subscribers in 2003; and

b.     At the end of 2003 the Telecom System had 8,200 subscribers but net revenues of a negative $800,000—nowhere near the million dollar profit projection in the original business plan.

60.     The Official Statements which were issued in April 2004, after the above referenced City Council meeting, are misleading because they portray the Telecom System as being in a "developmental stage" in the "Historic Results of Operations" section (OS p. 20) and represent that the Telecom System was not expected to break even until 2007 but fail to disclose the fact that the Telecom System had been projected to achieve profitability during 2003 and had failed.

61.     The "Historic Results of Operations" section of the Official Statements (OS p. 20) also represents that: "no historic presentation of operations would be relevant to any decision to invest in the Notes and, therefore, has omitted any such representations, other than what appears in the audited financial statements included in 'Appendix B.'"

62.     The Financial Statements (Appendix B to the Official Statements) contain profit and loss figures for 2002 and 2003 but do not state that the Telecom System had been expected to be profitable in 2003 and had failed.

63.     The above representation in the Official Statements regarding "historic presentation of operations," when viewed in context with the limited historic information provided in the Financial Statements, is misleading due to the failure to disclose the material fact that the Telecom System had been projected to achieve profitability during 2003 and had failed.

64.     Alameda resident and freelance writer, Len Grzanka ("Grzanka"), addressed the City Council during the October 21, 2003 City Council meeting and stated that the Telecom System had failed to meet the projections presented in its original business plan.

65.     Grzanka reminded the City Council that the $33 million anticipated cost of the Telecom System as of October 2003 was more than three times what the City originally told its citizens the Telecom System would cost.

66.     The Official Statements, in the "Prior Investment in the Telecom System; Existing Obligations" section (OS p. 21) represents:

> "Upon the issuance of the Notes, Alameda P&T will have expended for the design, acquisition, construction, improvement, equipping and operation of the Telecom System (a) $10,000,000 in advances from its available reserves which are repayable only after all of the Notes have been fully paid and retired, (b) approximately $16,000,000 in proceeds of obligations (evidenced by certificates of participation designed as "Series 2000B") which are being retired upon the issuance of the Notes, (c) approximately $18,666,000 in funds advanced or allocated internally for such purposes."

67.     The Feasibility Study, Task 2 Report page 8 of 10, represents that approximately $26 million in capital expenditures would be made on the Telecom System between 2004 and 2007.

68.     The Official Statements and Feasibility Study are misleading because they portray the cost of the Telecom System as something that was planned all along without disclosing that the cost of the Telecom System was already a product of substantial cost overruns.

69.     During the October 21, 2003 City Council meeting Grzanka stated that AP&T "ended up raising electric rates to cover AP&T's contribution to the General Fund."

70.     No councilmember disputed Grzanka's assertion that AP&T raised electric rates to subsidize the Telecom System.

71.     During the October 21, 2003 City Council meeting Councilmember Kerr stated that "as an electric ratepayer she did not want to subsidize the cable television business."

72.     Councilmember Kerr stated that AP&T was "expected to contribute to the City's General Fund and AP&T had not made a profit on its above-ground infrastructure" and inquired "how the next phase of the System build out would be able to provide a profit."

73.     Councilmember Kerr expressed concern that electric rates would have to be raised to subsidize the Telecom System.

74.     No councilmember disputed Councilmember Kerr's assertion that electric rates would have to be raised to subsidize the Telecom System.

75.     The City Council expressed reluctance to loan AP&T money from the General Fund during the City Council meeting on October 21, 2003.

76.     The other alternative posed to the City was a subsidy from the Electric Division to the Telecom System.

77.     The City Council recognized that the City had promised its residents from the inception of the Telecom System that it would create a "firewall" between the Electric Division and Telecom System to ensure that the Telecom System would work on its own and would not jeopardize the electric business.

78.     Despite the firewall that had been put in place to protect the Electric Division revenues, the City Council acknowledged during its October 21, 2003 meeting that AP&T needed a "subsidy" to continue to operate the Telecom System.

79.     During the October 21, 2003 City Council meeting Councilmember Kerr stated that AP&T would have to sign up "50% of television owners in Alameda to break even, that the break even number had changed in every report to the City Council, that the infrastructure costs were not being paid off from the revenue, that the General Fund was being threatened and that a promise was made that the Telecom System would be treated like a business and borrowing from the City's General Fund was not treating it as a business."

80.     AP&T's General Manager responded that it was "assumed" there would be a profit when the Telecom System was built out.

81.     By late 2003, the Alameda Defendants knew AP&T was changing failed internal breakeven projections by projecting greater market penetration (more customers) than had previously been projected and more time to achieve breakeven.

82.     By late 2003 the City Council was openly skeptical of AP&T's changing projections.

83.     By late 2003 the Alameda Defendants knew that the substantial changes to the business plan with respect to breakeven and infrastructure costs, which were made to make the Telecom System appear to be economically feasible, actually demonstrated that the System was not economically feasible.

84.     The Official Statements and Feasibility Study, issued in April 2004, approximately six months following the above-referenced City Council meeting, are misleading because they make repeated references to the "business plan" but fail to disclose that AP&T had changed the business plan to compensate for failed internal breakeven projections by projecting greater market penetration than had previously been expected and more time to achieve breakeven.

85.     During the October 21, 2003 City Council meeting Vice Mayor Daysog stated that City "residents wanted AP&T to be in the cable television business because the rates and services are better but it would be preferable for AP&T to use its own money to the extent possible."

86.     During the October 21, 2003 City Council meeting Councilmember Gilmore inquired whether Telecom System "rates would be raised."

87.     The AP&T General Manager responded in the negative stating that "higher rates become less competitive."

88.     The rates being charged by AP&T were already substantially lower than rates charged by Comcast.

89.     The General Manager's response to Councilmember Gilmore was a tacit admission of what the Alameda Defendants already knew—the Telecom System already could not compete with Comcast and could not raise rates.

90.     The Official Statements, which were issued in April 2004, represent as follows regarding rate increases:

a.    "Although Alameda P&T's Business Plan contemplates adjustments in rates, charges and costs which will enable it to comply with the rate covenant, there remains a risk that changes in costs and competitive conditions could exceed those contemplated in the plan."  (OS p. 3).

b.    "Alameda P&T's business plan, consistent with the advice of its advisers and feasibility consultants, contemplates measured but competitive annual adjustments in most services and pricing categories over the next five years." (OS p. 19).

c.    "Although Alameda P&T's Business Plan, is consistent with the rate covenant, there remains a risk that changes in cost and competitive conditions could exceed those contemplated in the plan." (OS p. 19).

d.    "Because the Telecom System is in a developmental stage, Alameda P&T has made only a limited rate covenant (compliance with which is subject to periodic review by Alameda P&T, among others, in light of the financial performance of the Telecom System, competitive conditions and other factors) with respect to its installment payment obligation related to the Series 2002A obligations described herein .  .  . The rate covenant does not obligate Alameda P&T to establish rates so as to assure payment of the installment payments or principal of and interest on the notes.  Under this rate covenant Alameda P&T intends that, by the maturity date of the notes, the rates and charges for the services of the Telecom System will have been adjusted and costs will have been managed in order to enable Alameda P&T to make installment payments related to the Series 2002A obligations from available Telecom System revenues when due.  Although Alameda P&T's business plan contemplates adjustments in rates, charges and costs which will enable it to comply with the rate covenant, there remains the risk that changes in cost and competitive conditions could exceed those contemplated in the plan.  Under such circumstances, any adjustments by Alameda P&T would be subject to an analysis of their potential impact on the financial performance of the Telecom System." (OS p. 3).

18

e.    "Because the Telecom System is in a developmental stage, for purposes of the notes and the installment payments Alameda P&T is making only a limited rate covenant, although its general policy is to establish rates and charges which over the long term may enable it to recoup the average incremental cost of servicing its customers." (OS p. 19).

f.    "In order to maintain the growth of its customer base and enhance the diversity and resilience of its revenue sources, Alameda P&T intends to establish and collect rates and charges for services, either individually or in menus of combinations, which enable many of its customers to select services on a cost-effective basis which is frequently below the prices established for competing services either locally or within the greater region or, both." (OS p. 19).

g.    "Nevertheless, Alameda P&T's business plan, consistent with the advice of its advisors and feasibility consultants, contemplated measured but competitive annual adjustments in most services and pricing categories over the next five years." (OS p. 19).

h.    "Alameda P&T intends that, by the maturity date of the notes, the rates and charges for the services of the Telecom System will have been adjusted and costs will have been managed in order to enable Alameda P&T to pay the Series 2002A obligations from available Telecom System revenues when due; the rate covenant does not obligate Alameda P&T to establish rates so as to ensure payment of the installment payments or principal of and interest on the notes." (OS p. 19).

i.    "Although Alameda P&T's business plan is consistent with the rate covenant, there remains a risk that changes in costs and competitive conditions could exceed those contemplated in the plan.  Under such circumstances, any adjustments by Alameda P&T would be subject to an analysis of their potential impact on the financial performance of the Telecom System." (OS p. 19).

91.    The Feasibility Study represents as follows regarding rate increases:

a.   AP&T's average revenue per user is below benchmark but AP&T "has planned a series of rate increases through 2006" to increase average revenue per user. (Feasibility Study; Task 1 Report, p. 3).

b.   Although rates were currently low, the business plan for 2004-2006 called for rate increases of 5%, 3%, and 3% respectively.  (Feasibility Study; Task 1 Report, p. 5).

c.   The Feasibility Study states that the rate increases are designed to lift average revenue per user to $43.45 in 2006 (Feasibility Study; Task 1 Report, p. 5).

d.   The Feasibility Study recommends that AP&T implement rate increases on its internet pricing to industry peer level.  (Feasibility Study; Task 1 Report, p. 6).

e.   The Feasibility Study represents that AP&T's revenue metrics benchmark realistically to peers.  (Feasibility Study; Task 1 Report, p. 8).

f.   "Penetration of the video market is excellent compared to peer performance .   .   . Alameda should take steps over the medium term to defend its ability to control programming costs.  It has aggressively (and successfully) used both price discounting and more video channels to capture market share.  It needs to now ensure that it is protected from margin erosion.  While price discounting is an expected source of competitive advantage for municipalities entering the broadband sector, it needs to be used carefully and strategically to ensure that future revenue streams are protected from price erosion and/or collapsing gross margins."  (Feasibility Study; Task 2 Report, pp. 1, 3 and 4).

g.   "Uptown recommends that Alameda consider a more targeted approach to where it competes across the video product category.  It is offering price discounts which range from 13% to 20% across its video product line.  The only product it matched price on [with Comcast] is pay per view.  This is analogous to the 'tax cut' approach where across-the-board reductions are used to compete.  The problem with this approach is the opportunity cost of foregone EBITDA [earnings before interest, taxes, depreciation and amortization which is a metric that can be used to evaluate a company's

20

profitability] dollars as well as the lack of a customized discounting strategy to attract the best customers. Especially where [Alameda's] channel lineup compares favorably with Comcast, the price discount should be minimal or even zero."  (Feasibility Study; Task 2 Report, pp. 8 and 9).

92.     The above alleged representations regarding rates in the Official Statements and Feasibility Study are misleading because they fail to disclose AP&T's historic inability and unwillingness to raise rates as discussed by the Alameda Defendants during the October 21, 2003 City Council meeting.

93.     Councilmember Mataresse stated during the October 21, 2003 City Council meeting that the City had "too much invested not to complete the investment" and the City should find a way to finance the Telecom System buildout.

94.     As alleged above, AP&T also had a contractual obligation to Vectren to complete and operate the Telecom System.

95.     On November 18, 2003 the City Council met again to discuss transferring funds from the Electric Division to the Telecom System.

96.     During this meeting the City questioned the previous advances from the Electric Division to the Telecom System noting that the "firewall" was put in place between the Electric and Telecom divisions to protect the City from a lender like Citibank accessing the Electric Division assets to pay off the COPs.

97.     The Alameda Defendants were very concerned that the 2000B COP holder (Citibank) would take the incomplete Telecom System with its relatively few customers, sell it, and apply the proceeds to the 2000B COPs.

98.     The Alameda Defendants were very concerned that a sale of the Telecom System in 2004 would not be sufficient to repay the 2000B COPs and believed Citibank would then access Electric Division assets to pay off the COPs.

99.     During the November 24, 2003 City Council meeting Councilmember Kerr stated that "operating expenses in the business plan were $3.5 million; actual costs were $9.5 million; the number

21

of customers needed to break even was 6,000 in the business plan; now, the number is 16,000; the original business plan was for a different system; costs have been moving targets, which causes her concern about loaning money."

100.    The City Council knew AP&T, having failed to achieve profitability in 2003 and having otherwise failed to reach its projections, was now inflating its projections to make an uneconomic project appear feasible.

101.    The Official Statements, issued in April 2004, are misleading due to the failure to disclose that AP&T failed to achieve the projections in its initial business plan and had modified the business plan by substantially inflating its market penetration projections.

102.    Vice Mayor Daysog agreed that the Telecom System should move forward; however, he stated that "structures and systems should be in place that ensure there is firm footing."

103.    The "firm footing" ended up being the City's decision in February 2004 to issue the Notes with less security than the 2000B COPS, repay the 2000B COPs and shift much of the risk of the anticipated failure of the Telecom System to Note holders.

104.    As of 2003 there were approximately 29,000 households in Alameda of which approximately 11,000 were multiple dwelling units ("MDUs") such as apartments and condominiums.

105.    During the November 24, 2003 City Council meeting Councilmember Kerr inquired why the "buildout strategy has not included multiple dwelling units, which would be cheaper to install."

106.    AP&T's marketing specialist responded that "property owners have rights over telecom access" and "have exclusive contracts with satellite companies."

107.    During the October 22, 2003 City Council meeting Grzanka informed the City Council that because of the prevalence of MDUs, and with competition from satellite and Comcast, a target of even 8,000 subscribers would comprise 28% of the market and this was a very ambitious goal considering the market.

108.    The Federal Communications Commission, prior to the issuance of the Official Statements, issued a report in January 2004 titled "Federal Communications Commission, Annual

Assessment of the Status of Video Competition in the Market for the Delivery of Video Programming, Tenth Annual Report," MB Docket No. 03-172, Released January 28, 2004 (the "FCC Annual Report").

109. The FCC Annual Report (p. 46 and Appendix B, Table B-1) showed that, by early 2004, it was common knowledge within the telecommunications industry that direct broadcast satellite systems ("DBS" or "satellite-based systems") had, on a national level, already penetrated approximately 22% of the market, cable subscribership was not growing or was in decline, and satellite subscribership was increasing annually by 2.8%.

110. On February 9, 2004, a telecom industry study performed by Michigan State University determined that:

> "Unlike the situation prior to the emergence of the national direct broadcast satellite (DBS) television services in the mid-1990's, it is indisputable that cable operators face direct competition in the provision of their primary service, multichannel television. Today the local cable operator competes directly with two highly successful DBS services who, nationwide, have captured approximately 22% of all multichannel television service customers."

> *Assessing the Policy Implications of Overbuild Competition,* Steven S. Wildman, Michigan State University, February 9, 2004, page 21, 24 ("Wildman Study").

111. The Wildman Study went on to state: "Based on the US experience with overbuild competition to date, it would be dangerous to assume that overbuilders could profitably enter and offer services in the typical community in which a single cable company currently competes with two satellite services." *Wildman, supra at p. 4.*

112. A study conducted by the Beacon Hill Institute in March 2004 concluded,

> "While cable serves 75% of the market now, the growth of noncable service far exceeds that of cable. 'In the last several years, however, cable subscribership has declined such that as of June 2003, there was approximately the same number of cable subscribers as there were at year-end 1999.' The principal source of growth in noncable service is Direct Broadcast Satellite (DBS). From 1993 to 2003 satellite subscribers increased from 3.1 million to 23.7 million, representing growth of 644%. Even more telling is the DBS growth rate which 'has exceeded the growth rate of cable by double digits in every year except in the past year, when the DBS growth rate exceeded cable growth by 9.16 percentage points'"

*Municipal Broadband in Concord: An In Depth Analysis,* David G. Tuerck, PhD and John

Barrett, MSc, Beacon Hill Institute, March 2004 at p. 37 ("Beacon Hill Study").

113.    The Alameda Defendants, prior to the issuance of the Official Statements, knew that

satellite companies were cutting into its customer base and had already caused AP&T to abandon a

key segment of the market.

114.    In the "System Development and Business Plan" section of the Official Statements (p.

15), the City represented that:

> "Alameda P&T also plans to allocate additional resources to connections with multi
> family apartment and condominium structures [MDUs], and where feasible to become
> the primary provider of digital television and high-speed internet services within those
> structures, which house approximately 26% of the City population and which
> experience an average of 1% to 2% annual change of resident population each year as
> residents relocate to the City, move to single family housing or leave the City."

115.    The "Competitive Technologies" section of the Official Statements (OS p. 25) further

represents that "other competitive technologies, internet and satellite-based television, have presented

weather-related (e.g. satellite "rain fade"), internet security, installation, maintenance and program

selection issues which are not generally limitations with the digital television technology offered by

AP&T . . ."

116.    By 2004 the above referenced "issues" with satellite-based systems had in fact been

solved.

117.    The above sections of the Official Statements and the Feasibility Study are misleading

due to the failure to disclose that, on a national level, DBS had already penetrated approximately 22%

of the market and that while cable subscribership was not growing or was in decline, satellite

subscribership was increasing annually by 2.8%. FCC Annual Report, supra at Appendix B,

Table B-1.

118.    The above sections of the Official Statements and Feasibility Study are misleading due

to the failure to disclose that AP&T had abandoned the substantial MDU segment of the market due to

competition from satellite-based systems.

24

119. The above sections of the Official Statements are misleading due to the failure to disclose that the problems with DBS had been solved.

120. During the November 24, 2003 meeting Vice Mayor Daysog inquired whether "it was healthy to reduce electric fund working capital" and inquired "whether the fund shifts [to the telecom division] were occurring because there was a fundamental problem or if the telecom system was healthy."

121. There was no response to Vice Mayor Daysog's questions.

122. By late 2003, it was obvious to the Alameda Defendants that there was a fundamental problem—the Telecom System was not economically feasible.

123. During the November 24, 2003 meeting Board member Bangert stated that a "return on the investment into the Telecom System is not an appropriate measure—the goal was to meet the needs of residents." She stated that the rate structure "would be different if a return on the investment was the goal."

124. No councilmember disputed Board member Bangert's assertion that AP&T anticipated no return on the investment in the Telecom System.

125. The Alameda Defendants knew, prior to issuing the Official Statements, that in addition to keeping rates low due to the inability to compete with Comcast, rates were also being kept artificially low and were not being raised so that Alameda residents' television and internet services could be subsidized.

126. The above alleged sections of the Official Statements and Feasibility Study that address rates are also misleading due to the failure to disclose that AP&T was not operating the Telecom System for a return on investment and was keeping the rates it charged its customers artificially low.

127. The City Council agreed to vote on the $7 million General Fund loan request during the December 16, 2003 meeting.

128. During the December 16, 2003 City Council Meeting the City Council noted that the original line of credit to AP&T was $16 million when Vectren was a partner in the project and the $16

million loan needed to be refinanced by May 31, 2004 or the system would be turned over to Vectren

to repay the loan, or, if Vectren chose not to repay, then the Telecom System would go to Citibank.

129.    During the December 16, 2003 meeting Councilmember Kerr engaged in the following

exchange that was recorded as follows in the City Council meeting minutes:

> "Councilmember Kerr stated that there is a debt of $55.7 million; if not refinanced, the existing system will go to Vectren; inquired if the City would be relieved of the $16 million debt and the $6.2 million owed to Vectren; stated the loss would be $10 million if not refinanced; if the system is built out, there would be approximately $56 million in debt; AP&T might be able to sell the system for about $40 million; the minimum investment amount would be $55.7 million to build out the system, not including prevailing wage considerations or net operating loss; stated if the system build out does not make money and AP&T wants to sell, it will be a buyer's market and the City could lose more than $10 million."

130.    No councilmember objected to Councilmember Kerr's statement that the Telecom

System, once it was built out, would likely need to be sold at a loss.

131.    The Official Statements are misleading due to the failure to disclose that the Alameda

Defendants believed that if the incomplete System was not refinanced Citibank would sell it and

AP&T would likely suffer a $10 million loss.

132.    The Official Statements are misleading due to the failure to disclose that the Alameda

Defendants believed that, if the System was built out and did not make money, then it would be a

buyer's market and, when the System was sold, AP&T could lose more than $10 million.

133.    The Official Statements and Feasibility Study are misleading because they create the

false impression that AP&T intended to operate the System as a business over the long term (such as,

for example, by issuing long term municipal revenue bonds in 2009 to pay off the Notes) without

disclosing that the AP&T would likely have to sell the System after it was built out and the customer

base was increased.

134.    For the above alleged reasons, the City was not willing to risk loaning $7 million from

the General Fund to AP&T for the Telecom System and, on December 16, 2003 the City Council only

approved a $2.2 million loan.

135. On February 17, 2004 (prior to completion of the false and misleading sections of the Official Statements which are referenced throughout this Counterclaim) City Councilmembers met and approved the issuance of $33 million Series 2004 Revenue Bond Anticipation Notes (the "Notes").

**The Official Statements and Feasibility Study Made False
and Misleading Statements Regarding Programming Costs**

136. The Feasibility Study (Task 2 Report, APT/FSN Model/Base Case p. 2), projected AP&T's programming costs would increase 4% per year.

137. It was common knowledge within the telecommunications industry that programming costs were increasing on a national basis at an average rate of 6% to 12% per year. Municipal Broadband: Optimistic Plan, Disappointing Reality; Heartland Policy Study #108 by Steven Titch, June 2005; FCC Annual Report at page 24.

138. The broker-dealer and investment banking firm Goldman Sachs prepared a report captioned, "Goldman Sachs, US Media: Cable/Satellite Industry Overview, March 19, 2004 (the "Goldman Sachs Report").

139. The Goldman Sachs Report (pp. 1, 50-51) stated that programming costs would only increase over time (9% yearly for large multiple system operators ("MSO" - an operator of multiple cable television systems)) and pose the biggest challenge to cable's margins, putting large MSO's with buying power (like Comcast but not small municipalities like AP&T), in the best position to control programming costs.

140. The Beacon Hill Institute conducted a study in March 2004 that criticized programming cost projections that Uptown had recently used in a feasibility study conducted for Concord, Massachusetts:

> "Uptown assumes that programming costs will rise by 1% each year for the fifteen years of the case study. This rise in programming costs is offset by a 1% rise in cable prices every year for the fifteen years of the analysis. While this might be practical if programming costs indeed rose by only 1%, it is not realistic if programming costs increase by the higher rates seen in the current marketplace. 'At perennial increases of 11% to 13%, programming costs have put a major dent in

industry video margins in recent years' according to Salomon Smith Barney analyst Niraj Gupta."

*Beacon Hill Study, supra at p. 24.*

141.    For MSOs like Comcast, programming expenses were actually 33% to 40% of revenue in 2003, which is what the Alameda Defendants projected for AP&T in 2008.

142.    As an experienced telecom system operator, the Alameda Defendants knew that they had little or no control over increases in programming costs and knew that programming costs had historically increased substantially on an annual basis, were expected to substantially increase on an annual basis in the future and knew AP&T had historically refused to raise rates yet, nonetheless, caused Uptown to project in the Feasibility Study that programming costs would increase at a much lower rate than they had increased on a historic basis and were believed by the City to likely increase in the future.

143.    The Official Statements and Feasibility Study are misleading because the Feasibility Study (Task 2 Report, APT/FSN Model/Base Case p. 2) projected AP&T's programming costs to increase 4% per year but fail to disclose the fact that programming costs had been increasing at an average rate of 6% to 12% per year as reported by the Federal Communications Commission in its Annual Report, *supra* at p. 24; *Municipal Broadband: Optimistic Plan, Disappointing Reality, supra.*

144.    The Official Statements and Feasibility Study are misleading because the Feasibility Study (Task 2 Report, APT/FSN Model/Base Case p. 2) shows programming expense as declining as a percent of operating revenue over time and projects programming expenses to only be 40% of AP&T's operating revenue by 2008 but fail to disclose AP&T's historic inability and unwillingness to raise rates (which would indicate that programming costs were likely to comprise a much greater percentage of revenue in the future).

### The Official Statements and Feasibility Study Make False and Misleading Statements Regarding Voice Telephony

145.    The Goldman Sachs Report (p. 22) stated as follows regarding the emergence of voice telephony in the marketplace:

COUNTERCLAIM; DEMAND FOR JURY TRIAL
Case No. C 08-04575 SI

a.   On a national basis cable companies already offered triple play [cable, internet, voice] service to 30% of the United States with an expectation of 80% coverage by 2008;

b.   The voice option was viewed as critical to reducing churn (turnover rate of subscribers) with a 70% lower churn rate when customers take a triple-play option.

146.   AP&T stated in the Financial Statements for the fiscal year that ended in June 2003 that were attached to the Official Statement (OS , Appendix B, p.7) that "AP&T does not have plans to become a competitor in the wire line telephone business."

147.   There is no other discussion of the voice component in the Official Statements, Financial Statements or Feasibility Study.

148.   The Official Statements (OS p. 25), state that AP&T's system architecture has "led Alameda P&T to the expectation that it can continue to deploy advanced technology and service quality as a strong competitor for other providers and technologies."

149.   As the operator of the Telecom System, the Alameda Defendants knew that it was vitally important to offer "triple play" services (i.e. video, internet and telephone) to its customers and knew that it would be much more difficult to raise rates to Telecom System customers and be competitive in the marketplace unless it added the voice component to the Telecom System.

150.   The Official Statements and Feasibility Study are misleading due to the failure to disclose that a failure to add voice to create a "triple-play" of bundled services would put the Telecom System at a material competitive disadvantage.

151.   The Official Statements and Feasibility Study are misleading due to the failure to disclose that cable companies already offered "triple play" services to 30% of the United States and expected 80% coverage by 2008.

152.   The Official Statements and Feasibility Study are misleading due to the failure to disclose that service providers who were poised to offer triple-play services could expect 70% lower churn (customers leaving the Telecom System).

153.   The Alameda Defendants knew that the prior operational history of the Telecom System, including the substantial cost overruns, failure to meet projections and ever changing

assumptions regarding market penetration and breakeven date as reflected in the various iterations of the business plan and periodic reports generated by AP&T and as referenced during the above alleged City Council meetings would be material to a reasonable investor's investment decision.

154.    The Alameda Defendants knew, as reflected in the above alleged statements made during City Council meetings, that the various iterations of the business plan and historic reports for the Telecom System would likely cause a reasonable investor to conclude that the Telecom System was not economically feasible and that the AP&T very likely could not achieve any of the above alleged key representations of the issuer.

**The Official Statements and Feasibility Study Contain
Additional False and Misleading Statements of Material Fact**

155.    In the "System Development and Business Plan" (OS pp. 14-15) section of the Official Statement, the City represented, subject to "certain Risk Factors," that:

> "Alameda P&T would anticipate beginning to realize net Telecom System operating revenues available for the installment payments and the Series 2002 obligations beginning in 2007, and, subject to market and other conditions then prevailing (and the risk factors described below), net Telecom System operating revenues sufficient to support a revenue bond or similar refinancing of the notes at or prior to their maturity on June 1, 2009."

156.    The above referenced section of the Official Statements is misleading due to the failure to disclose all of the above alleged material facts.

157.    In the "Certain Risk Factors" section of the Official Statements, the Alameda Defendants address competition from "competitive providers" including Comcast (OS pp. 23-24) and, to cast AP&T's competitive position in a positive (but misleading) light, representing only positive features of the Telecom System such as greater bandwidth and more concentrated signal distribution with modular, plug-and-play upgrading capabilities without disclosing any of the above alleged material facts indicating the Telecom System could not compete.

158.    The Official Statement and Feasibility Study are misleading because they make repeated references to the "business plan" thereby creating the false impression that all material provisions of the business plan were accounted for in the Official Statements and Feasibility Study

while failing to disclose that the "business plan" had been repeatedly changed by inflating market penetration projections, projecting increasing rates and projecting that programming costs would decline as a percent of operating revenue while failing to disclose the historic cost overruns, the historic inability and unwillingness of the AP&T to raise rates, and the historic inability of the Telecom System to compete with Comcast and other service providers.

159. Like the Official Statements, the Feasibility Study is misleading because it failed to disclose the following material facts: (1) cable providers were losing subscribers at a rate of approximately -.6% annually while DBS providers were gaining subscribers at an average of 2.8%; (2) as of February 2004 DBS services, nationwide, had captured approximately 22% of the market; (3) triple play services were becoming increasingly important to staying competitive; (3) nationally, by March 2004, cable companies offered triple play service to 30% of the United States with an expectation of 80% coverage by 2008; and (4) a voice option was viewed as critical to reducing churn (turnover rate of subscribers); there is 70% lower churn when customers take a triple-play option.

**Stone & Youngberg and Uptown Acted Knowingly or Acted With Intentional Disregard**

160. As an experienced underwriter, Stone & Youngberg knew that, before it could represent to potential purchasers of the Notes that "no historic presentation of operations would be relevant to any decision to invest in the Notes" (OS p. 20), it had a duty to review the historic operation of the Telecom System to determine whether that representation was accurate and not misleading.

161. As an experienced underwriter of municipal bonds, Stone & Youngberg knew that the City Council was likely to have reviewed the business plan and other reports addressing the historic operation of the Telecom System and knew that the City Council likely discussed the business plan and other reports addressing the operation of the Telecom System during City Council meetings.

162. As a broker-dealer and experienced underwriter of municipal bonds, Stone & Youngberg also knew that it could access reports such as the hereinabove alleged reports prepared

by Goldman Sachs, Beacon Hill, Wildman and the FCC and that such reports would likely contain material information regarding the key representations of the Authority regarding the Telecom System.

163.    Stone & Youngberg either reviewed the historic operations of the Telecom System, reviewed the above alleged City Council meeting minutes and reviewed the above alleged reports or, in an extreme and reckless departure from the standards of ordinary care, knew that it failed to take any such action and knew that it had no idea whether the above alleged representations in the Official Statements and Feasibility Study were accurate and not misleading.

164.    As a telecommunications expert, Uptown knew that it had a duty to review the historic operation of the Telecom System to determine whether the above alleged representations in the Feasibility Study were accurate and not misleading.

165.    As a telecommunications expert, Uptown also knew that it could access reports such as the hereinabove alleged reports prepared by Goldman Sachs, Beacon Hill (which in part, criticized another Uptown study), Wildman and the FCC and that such reports would likely contain material information regarding the reasonableness of the assumptions used in the Feasibility Study.

166.    Uptown either reviewed the historic operations of the Telecom System and reviewed the above alleged reports or, in an extreme and reckless departure from the standards of ordinary care, knew that it failed to take any such action and knew that it had no idea whether it had failed to disclose material facts needed in order to make the Feasibility Study not misleading.

### Stone & Youngberg Issued a "New Issue Credit Report" in March 2004 Which Made the Telecom System Appear Economically Feasible and Worthy of Financing Through a Purchase of Notes

167.    Stone & Youngberg issued a New Issue Credit Report in March 2004 which announced the upcoming offering of the Notes and provided the Report to the investment advisor for the Nuveen Funds and Pacific.

168.    Among other things, the New Issue Credit Report represented that:

32

a.   The Telecom System's expenses had exceeded revenues in its first two years of operation so that the City's electric utility had financially supported the Telecom services function, but was "expected to breakeven by 2007, however, prior to the Notes maturity";

b.   In addition to a net revenue pledge, the Telecom System's assets-estimated at a current book value of approximately $21 million (or about $2,100 per customer) secured the Notes;

c.   Younger homeowners moving in to Alameda demand sophisticated telecom systems (thereby implying that the Telecom System was a sophisticated telecom system);

d.   The growth of the Telecom System to date indicates that AP&T, "is executing a strategy that may allow it to meet its customer and revenue targets, the credit underlying the Notes can be considered stable";

e.   AP&T's equipment allows it to, "provide wider bandwidth and faster and clearer signals to its customers than industry and local average";

f.   Completion of the Telecom System will provide AP&T, "more than will be required to meet the utility's minimum target of 21,500 subscribers, or 62% of the projected 34,500 utility customers in the City by 2009";

g.   According to a report prepared by AP&T's feasibility consultant projects, "Telecom revenue and expenses will be at breakeven by 2007, with net revenue available to pay note debt service beginning in 2007/2008" assuming completion of the Telecom System as planned;

h.   "Due to the early development stage of the Telecom System at this time, however, Alameda Power & Telecom has not made a rate covenant in regard to payment of the notes";

i.   "Net revenue for debt service is not anticipated to be available until approximately June 2007";

j.      "Since the Telecom System's net revenue is not expected to be sufficient to pay debt service, the notes semiannual interest will be capitalized through final maturity";

k.      "Alameda P&T intends to pay off all of the note principal at final maturity with proceeds from a long term revenue bond that will be issued at that time"; and

l.      "Alameda P&T may not issue any obligations that are senior to or on par with the notes.  Further junior or subordinate debt is permitted, however."

**The Notes Were Issued, Purchased by Stone & Youngberg and Sold to the Plaintiffs**

169.    The Preliminary Official Statement was prepared by the Alameda Defendants and Stone & Youngberg and was circulated to potential purchasers of the Notes, including the Nuveen Funds and Pacific, in March 2004.

170.    The Official Statement was duly authorized by AP&T on behalf of the City of Alameda, the Authority and APIC and was delivered on April 8, 2004.

171.    The Nuveen Funds and Pacific, through their authorized representatives, read and reasonably relied upon the Official Statements in connection with making their purchase decisions.

172.    Based upon information contained in the Preliminary Official Statement, the Stone & Youngberg New Issue Credit Report, meetings with Managers of the Telecom System, discussions with the CFO of the Telecom System, and a site visit to the City and Telecom System plant, on the dates and in the amounts set forth above the Nuveen Funds and Pacific purchased the $19,500,000 in face value of the Notes.

**The Nuveen Funds and Pacific Exercised Reasonable Care
and Did Not Discover They had Been Misled Until 2008**

173.    The Nuveen Funds and Pacific valued the assets of the Telecom System based upon a per subscriber market value of assets that ranged from a low of $2,000 per subscriber in some rural areas of the country to $4500 per subscriber in metro areas.

174.    Using the mid-point of the above range, the Nuveen Funds and Pacific used a per subscriber market value calculation to estimate the value of the Telecom System at $33.1 million which was sufficient in this start up project to cover the principal amount of the Notes one time.

175.    The above valuation method was provided to David Blair ("Blair"), a Nuveen analyst, by both Stone & Youngberg and the Chief Financial Officer of the Telecom System and was represented to be an appropriate method of estimating the market value of the Telecom System.

176.    The per subscriber market value method of valuing the assets of a telecom system was not an appropriate method for valuing the Telecom System because rapidly changing and advancing technology, AP&T's failure to pursue voice (and have the ability to market "triple play" services), and AP&T's known (but undisclosed) inability and unwillingness to raise rates served to substantially decrease the per subscriber value of the Telecom System.

177.    The City, as an experienced provider of telecom services, and Stone & Youngberg, as the underwriter of the Notes, knew that the per subscriber market value method of valuing the Telecom System was inappropriate as applied to the Telecom System and would likely result in the Nuveen Funds and Pacific's assigning an inflated value to the assets of the Telecom System, but nonetheless, recommended that the use of that methodology to value the assets of the Telecom System.

178.    The Nuveen Funds and Pacific did not know the truth with respect to the above alleged false and misleading statements of material fact and failures to disclose material facts.

179.    AP&T's "Comprehensive Annual Financial Report for the fiscal Years Ended June 30, 2004 and 2003" (2004 Financial Statement) was issued on November 29, 2004.

180.    The 2004 Financial Statement (p. 7), stated, "Since launching cable television service in July 2001 and Internet services in February 2002, Alameda P&T has increased its subscriber base to 7,603 video and 3,447 Internet customers for a total of 11,050 customers."

181.    The 2004 Financial Statement (p. 25), went on to state, "Alameda P&T achieved a 36% increase in the number of customers in fiscal year 2004. The number of customers increased from 8,787 customers at the end of fiscal year 2003 to 11,927 customers at the end of fiscal year 2004."

182.    In April  2005 Valerie Fong ("Fong"), the General Manager of AP&T, told Blair that VoIP (voice or telephony) services were "a lower priority at this time for Alameda P&T as well apparently as for Comcast" but said she expected Comcast to offer residential 'digital phone' by the end of 2005 or early 2006.

183.   Fong failed to disclose the fact that AP&T had no intention of ever adding VoIP.

184.   When asked about satellite-based systems, Fong reported that, "satellite penetration has remained flat in Alameda at approximately 7%" and that "customer loyalty to satellite services is very high and conversion opportunities are very limited."

185.   Fong failed to disclose that AP&T had abandoned the substantial MDU segment of the market before the Notes were issued as a result of competition from satellite-based systems.

186.   When asked about current customer allocation, Fong responded that roughly 44% of AP&T's customers choose bundled services.

187.   Fong failed to disclose that AP&T had no intention of ever adding VoIP services and, as a result, would not be able to offer the competitive triple-play "bundled services."

188.   The Nuveen High Yield Municipal Bond Fund purchased $250,000 in face value of the Notes from Stone & Youngberg in June 2006 in reliance upon the Official Statements and the above representations of the Alameda Defendants acting through AP&T.

189.   The Nuveen High Yield Municipal Bond Fund purchased $750,000 in face value of the Notes from Stone & Youngberg in September 2005 in reliance upon the Official Statements and the above representations of the Alameda Defendants acting through AP&T.

190.   In October 2005 Fong told Blair that AP&T signed up its 15,000th customer.

191.   By November 2005, Tom Lockard, a Stone & Youngberg investment banker, was in discussions with both AP&T and the Nuveen Funds and Pacific about making a pitch to the City to conduct an advance refunding of the Notes or call the Notes with the approval of the Note holders and repay them with the proceeds from long term bonds.

192.   On November 28, 2005 AP&T issued its Comprehensive Annual Financial Report for the Fiscal Years ended June 30, 2005 and 2004 (2005 Financial Report).  The 2005 Financial Report (p. viii) stated, "Since launching cable television service in July 2001 and Internet services in February 2002, Alameda P&T has increased its subscriber base to 9,433 video and 5,198 Internet customers for a total of 14,631 customers [or an increase of 3,581 customers]."

193.   The 2005 Financial Report (p. 3), went on to state:

"Alameda P&T's telecommunications division is transitioning from a construction mode to an operational mode and did not make a profit this year. Management is committed to the goal of profitability and continues to increase revenue and decrease expense."

194.    With respect to the Telecom rates, the FY2005 Financial Report (p.9), states:

"Similar to electric utility operations, Alameda P&T's telecommunications operating revenues are based on rate schedules authorized by the Board. Such rates are designed to recover Alameda P&T's cost of service and still be competitive with those providing similar services in Alameda."

195.    In August 2006 AP&T retained CCG Consulting, LLC ("CCG") of Beltsville, Maryland to analyze the Telecom System operation.

196.    On October 6, 2006, using the "per subscriber" valuation method recommended by Stone & Youngberg and AP&T, the Nuveen Funds and Pacific determined that the Telecom System appeared to have an enterprise value that exceeded total debt.

197.    As of October 2006, Nuveen was receiving interest payments from the capitalized interest fund, the Authority was not in default on the Notes and the Telecom System appeared to have sufficient value to repay the Notes.

198.    In December 2006 AP&T released a redacted version of the CCG report which recommended, among other things, that the Telecom System raise its rates and add voice telephony to complete its triple-play of services.

199.    In January 2007, the author of the CCG Report, Doug Dawson, conducted a press briefing where he stated he was "confident the utility can reverse its bleak financial outlook – if elected and appointed city officials have the 'political will' to follow his recommendations."

200.    Dawson also cautioned that it was "absolutely essential" for AP&T to add telephone service to raise revenues saying that "[i]f it doesn't add voice, it'll never achieve the highest level of profitability."  Alan Lopez, "'Political will' needed to alter AP&T fortunes," Contra Costa Times, Jan. 19, 2007.

201.    In January, 2007 City officials announced that they had hired a new General Manager for AP&T, Girish Balachandran ("Balachandran").

COUNTERCLAIM; DEMAND FOR JURY TRIAL
Case No. C 08-04575 SI

202.    In April 2007, Balachandran told the Alameda Public Utilities Board that AP&T was "moving quickly" to implement many of the changes recommended in the CCG Report.

203.    On December 18, 2007 Balachandran requested that Stone & Youngberg assist him in setting up a telephone conference with Bondholders where Balachandran observed, "As the quarterly financial reports have indicated for quite some time now, the Telecom System is not progressing economically as the City had hoped it would, and while we are looking into the feasible refinancing avenues, the current system break even economics are not promising."

204.    In February 2008, AP&T's financial advisor, Mark Northcross, reported to the Alameda Public Utility Board that the Telecom Division may have to be sold because refinancing the outstanding debt might be impossible.

205.    An article on Northcross' presentation reported that "[t]he utility doesn't have the money to pay off the Notes and, because the business is on such tenuous financial ground, refinancing may be impossible."  Alan Lopez, "Utility Looks to Sell Cable, Web services," Alameda Journal, Feb. 19, 2008.

206.    In March 2008, Balachandran confirmed that a consultant had been hired to identify and contact parties interested in buying the Telecom System.

207.    The investment advisor to the Nuveen Funds and Pacific was informed by Waller Capital (the entity hired by AP&T to find a buyer for the Telecom System) that the per subscriber market value method, contrary to AP&T's representation to the Nuveen Funds and Pacific, was not a valid methodology for valuing the assets of the Telecom System.

208.    AP&T failed to implement any of the changes recommended in the CCG Report despite its promises to do so.

209.    Citing competition from Comcast, AP&T steadfastly refused to raise rates (just as it had done before the Notes were issued) until late in 2008, after Vectren filed suit against the City for, among other things, failing to raise rates.

210.    A March 2008 article on the proposed sale cited City Treasurer Kevin Kennedy's original view that "the system would never be able to recover the infrastructure costs it paid, even if it

COUNTERCLAIM; DEMAND FOR JURY TRIAL
Case No. C 08-04575 SI

signed up every cable subscriber on the island," going on to observe that "[h]e turned out to be right." Chip Johnson, "Alameda Ready to Pull Plug on its Costly Foray into Telecom," San Francisco Chronicle, Mar. 25, 2008.

211.    As alleged above, from April 2004 until early 2008 the Alameda Defendants, acting through AP&T, remained in direct contact with the Nuveen Funds and Pacific and continued to falsely represent that AP&T intended to continue to operate the Telecom System and could either refinance the System or sell the System for enough to pay off the Notes without ever disclosing that they knew before the Notes were even issued that the Telecom System was not economically feasible and would very likely have to be sold for a loss.

212.    The Nuveen Funds and Pacific, having exercised reasonable care, did not learn that they may have been defrauded until mid-2008 at the earliest.

213.    The Nuveen Funds and Pacific, having exercised reasonable care, also failed to learn that they may have been defrauded due to the above alleged fraudulent concealment of the Alameda Defendants and Stone & Youngberg.

214.    On September 24, 2008, pursuant to California Public Records Act ("CPRA"): Gov't Code §§ 6250-6268, the Nuveen Funds sent the City a letter ("Records Request") requesting access to and copies of records relating to the Telecom System.  The Records Request was served via certified mail to the records custodian for the City of Alameda.  The City received the Records Request on September 29, 2008.

215.    The Alameda Defendants filed this civil action seeking declaratory judgment on October 1, 2008.

216.    On Friday, October 10, 2008, the Alameda Defendants responded to the Records Request providing documents which the City believed were responsive to some of the categories of documents requested.

217.    The Alameda Defendants failed to provide any of the other documents referenced in the City Council meetings as discussed herein.

218.    The Alameda Defendants stated they will need "at least" an additional 14 days to more fully respond and will identify any records specifically requested which the Alameda Defendants believe are exempt from disclosure (disregarding the fact that the CPRA [Cal. Gov't Code § 6253(c)] allows for only one fourteen day extension to respond to a records request).

219.    As a direct and proximate result of the Defendants wrongful conduct, the Nuveen Funds and Pacific have collectively suffered damages in an amount which is presently unknown but are expected to exceed $11 million.

### FIRST CLAIM FOR RELIEF
**(Section 10(b) of the Securities Exchange Act of 1934 and
SEC Rule 10b-5 Promulgated Thereunder, on behalf of the Nuveen Funds and Pacific)
(Asserted Against All Defendants)**

220.    The Nuveen Funds and Pacific repeat the allegations of all preceding paragraphs of the Counterclaim and incorporate the same by reference.

221.    The City, AP&T, Authority, APIC, Stone & Youngberg and Uptown, directly and indirectly, singly and in concert, in connection with the offerings and sales of the Notes to the Nuveen Funds and Pacific, recklessly, knowingly and/or with an intention to defraud, made, one or more misrepresentations or failures to disclose material facts, which material facts were necessary in order to make the statements made in connection with those offerings and sales not misleading in light of the circumstances under which those statements were made all in violation of Section 10(b) of the Securities Exchange Act of 1934 [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] promulgated thereunder.

222.    The Official Statements and the appendices thereto were the principal selling documents for the Notes and were specifically intended and designed for the benefit and guidance of prospective investors, such as the Nuveen Funds and Pacific. The City, AP&T, Authority, APIC, Stone & Youngberg and Uptown knew that investors would rely on the information contained in said offering documents when deciding whether or not to purchase the Notes.

223.    The Nuveen Funds and Pacific, acting individually through their authorized representatives, read and reasonably relied upon the Official Statement and appendices thereto that

40

were prepared by the City, AP&T, Authority, APIC, Stone & Youngberg and Uptown in connection

with the offering of the Notes.

224.    The purpose, effect and result of the violations of Section 10(b) of the Securities

Exchange Act of 1934 and SEC Rule 10b-5 promulgated thereunder by the City, AP&T, Authority,

APIC, Stone & Youngberg and Uptown was to induce the Nuveen Funds and Pacific to purchase the

Notes, something they would not have done otherwise have done.

225.    As a direct and proximate result of the hereinabove-alleged violations of Section 10(b)

of the Securities Exchange Act of 1934 and SEC Rule 10b-5 promulgated thereunder, the Nuveen

Funds and Pacific have suffered damages.

## SECOND CLAIM FOR RELIEF
### (Section 20(a) of the Securities Exchange Act of 1934, on behalf of the Nuveen Funds and Pacific) (Asserted in the Alternative Against the City)

226.    The Nuveen Funds and Pacific repeat the allegations of all preceding paragraphs of

the Counterclaim and incorporate the same by reference.

227.    The City directly or indirectly controlled the Authority within the meaning of

Section 20(a) of the Securities Exchange Act of 1934 [15 U.S.C. § 78t(a)].  The City Council acted

as the board of directors of the Authority, made the false and misleading statements contained in

the Official Statements and possessed the power to control and did control the Authority's activities

that constitute violations of Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule

10b-5 promulgated thereunder.

228.    As a direct and proximate result of the hereinabove-alleged violations of Section

20(a) of the Securities Exchange Act of 1934, the Nuveen Funds and Pacific have suffered

damages.

///

///

///

///

41

**THIRD CLAIM FOR RELIEF**
**(Violation of Sections 25400, 25401, 25500, 25501 and 25504.1 of the California Corporate**
**Securities Act, on behalf of the Nuveen Funds and Pacific)**
**(Asserted Against All Defendants)**

229. The Nuveen Funds and Pacific repeat the allegations of all preceding paragraphs of the Counterclaim and incorporate the same by reference.

230. The City, AP&T, Authority, APIC, Stone & Youngberg and Uptown offered to sell and did sell the Notes from the state of California by means of written and/or oral communications which included untrue statements of material fact and omitted to state material facts necessary to make those statements made, in light of the circumstances under which they were made, not misleading in violation of §§ 25401 and 25501 of the California Corporate Securities Act.

231. The City, AP&T, Authority, APIC, Stone & Youngberg and Uptown were persons selling or offering for sale the Notes for the purpose of inducing the purchase of the Notes and made statements that, at the time and in light of the circumstances under which the statements were made, were false and misleading with respect to material facts, or which omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and which the City, AP&T, Authority, APIC, Stone & Youngberg and Uptown knew or had reasonable ground to believe were so false and misleading in violation of §§ 25400 and 25500 of the California Corporate Securities Act.

232. To the extent that the City, AP&T, Authority, APIC, and Uptown did not offer or sell the Notes to the Nuveen Fund and Pacific, they had knowledge of the false and misleading statements and/or omissions constituting the above-described primary violation of the California Corporate Securities Act and materially assisted in the above-described primary violation of the California Corporate Securities Act with the intent to deceive and/or to defraud in violation of § 25504.1 of the California Corporate Securities Act.

233. By virtue of the wrongful conduct of the City, AP&T, Authority, APIC, Stone & Youngberg and Uptown, the Nuveen Funds and Pacific were induced to and did purchase the Notes.

234.     As a direct and proximate result of the hereinabove alleged violations of the California Corporate Securities Act, the Nuveen Funds and Pacific have suffered damages.

**FOURTH CLAIM FOR RELIEF**
**(Illinois Securities Act, on behalf of the Nuveen Funds and Pacific)**
**(Asserted Against the all Defendants)**

235.     The Nuveen Funds and Pacific repeat the allegations of all preceding paragraphs of the Counterclaim and incorporate the same by reference.

236.     The City, AP&T, Authority, APIC, Stone & Youngberg and Uptown sold the Notes to the Nuveen Funds and Pacific in violation of 815 ILL. COMP. STAT. 5/12 and 5/13 (2006).

237.     The City, AP&T, Authority, APIC, Stone & Youngberg and Uptown, in connection with the purchases by the Nuveen Funds and Pacific of the Notes, directly and indirectly, negligently, recklessly, knowingly or with an intention to defraud, engaged in, offered for sale and sold the Nuveen Funds and Pacific securities in Illinois by means of one or more misrepresentations of or failures to disclose material facts, which material facts were necessary in order to make the statements made in connection with those offerings and sales not misleading in light of the circumstances under which those statements were made and, in addition, employed a device, scheme or artifice to defraud  the Nuveen Funds and Pacific and engaged in acts, practices and a course of business which operated as a fraud or deceit upon the Nuveen Funds and Pacific, all in violation of 815 ILL. COMP. STAT. 5/12(F), (G) and (I) (2006).

238.     As a direct and proximate result of the wrongful conduct of the City, AP&T, Authority, APIC, Stone & Youngberg and Uptown, the Nuveen Funds and Pacific have suffered damages.

**FIFTH CLAIM FOR RELIEF**
**(Common Law Fraud, on behalf of the Nuveen Funds and Pacific)**
**(Asserted Against Defendants Stone & Youngberg and Uptown)**

239.     The Nuveen Funds and Pacific repeat the allegations of all preceding paragraphs of this and incorporate the same by reference.

43

240. Stone & Youngberg and Uptown made material misrepresentations and omissions of past and present facts as more fully set forth hereinabove and knew the misrepresentations were false and misleading.

241. The misrepresentations and omissions, as hereinabove alleged, were made with the intent to induce each the Nuveen Funds and Pacific to purchase the Notes.

242. The Nuveen Funds and Pacific justifiably relied upon the representations contained in the Official Statements and, as a direct and proximate result, have suffered substantial damages.

**SIXTH CLAIM FOR RELIEF**
**(Aiding and Abetting Common Law Fraud, on behalf of the Nuveen Funds and Pacific)**
**(Asserted Against Defendants Stone & Youngberg and Uptown)**

243. The Nuveen Funds and Pacific repeat the allegations of all preceding paragraphs of this and incorporate the same by reference.

244. The City, AP&T, Authority and APIC knowingly made material misrepresentations and omissions of past and present facts as more fully set forth hereinabove.

245. Defendants Stone & Youngberg and Uptown were aware of this fraud and provided substantial assistance to advance the commission of the fraud.

246. As a direct and proximate result of the hereinabove-alleged wrongful acts, the Nuveen Funds and Pacific have suffered damages.

**SEVENTH CLAIM FOR RELIEF**
**(Negligent Misrepresentation, on behalf of the Nuveen Funds and Pacific)**
**(Asserted Against Defendants Stone & Youngberg and Uptown)**

247. The Nuveen Funds and Pacific repeat the allegations of all preceding paragraphs of this and incorporate the same by reference.

248. Stone & Youngberg and Uptown provided information to the Nuveen Funds and Pacific without exercising reasonable care to ensure such information was complete and accurate and not misleading, as more fully set forth hereinabove.

249.     Stone & Youngberg and Uptown knew or should have reasonably foreseen that the Official Statements and the appendices thereto would be distributed to potential purchasers of the Notes, knew that such investors would rely on the information provided in said offering materials when deciding whether or not to purchase the Notes, and, therefore, had a duty to disclose or cause to be disclosed the material facts set forth hereinabove and had a duty to ensure that the representations made in the offering materials for the Notes were accurate and not misleading.

250.     Stone & Youngberg and Uptown breached their duty to the Nuveen Funds and Pacific by negligently making the above alleged misrepresentations of and failures to disclose material facts.

251.     The Nuveen Funds and Pacific justifiably relied upon the representations contained in the Official Statements and, as a direct and proximate result, have suffered substantial damages.

## RELIEF REQUESTED

The Nuveen Funds and Pacific request that the Court enter judgment in favor of the Nuveen Funds and Pacific, and against the Defendants, and each of them, jointly and severally, on each of the Nuveen Funds' and Pacific's Claims for Relief and award the Nuveen Funds and Pacific:

a.     Statutory damages or rescission;

b.     In the alternative, out-of-pocket damages;

c.     Prejudgment interest;

d.     Costs;

e.     Attorneys' fees pursuant to pertinent provisions of the applicable state securities acts; and

f.     Any other relief which the Court deems proper.

///
///
///
///
///
///

**DEMAND FOR JURY TRIAL**

Nuveen Funds and Pacific hereby demand a jury trial with respect to their counterclaims.

Dated:  October 16, 2008

Respectfully submitted,

**MINTZ LEVIN COHN FERRIS
GLOVSKY AND POPEO P.C.**

Harvey I. Saferstein
Nada I. Shamonki

**DAVIS & CERIANI, P.C.**

/s/Michael P. Cillo
Michael P. Cillo (*Pro Hac Vice App. Pending*)
Melissa J. Hessler (*Pro Hac Vice App. Pending*)

*Attorneys for Counterclaim Plaintiffs Nuveen
Municipal High Income Opportunity Fund, the
Nuveen Municipal Trust on behalf of its series
Nuveen High Yield Municipal Bond Trust, and
Pacific Specialty Insurance Co.*

46

**CERTIFICATE OF SERVICE**

I am a resident of the State of California, over the age of eighteen years, and not a party to the within action. My business address is 2029 Century Park East, Suite 1370, Los Angeles, California 90067.

I hereby certify that on October 16, 2008, I electronically filed the **COUNTERCLAIM; DEMAND FOR JURY TRIAL** with the Clerk of the Court by using the CM./ECF system which will send a notice of electronic filing to all CM/ECF registered parties.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on October 16, 2008, at Los Angeles, California.

JAZMIN LEON

COUNTERCLAIM; DEMAND FOR JURY TRIAL
Case No. C 08-04575 SI