IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY OF ALAMEDA, *et al.*,<br><br>    Plaintiffs,<br><br>  v.<br><br>NUVEEN MUNICIPAL HIGH INCOME OPPORTUNITY FUND, *et al.*,<br><br>    Defendants.<br>_____/ | No. C 08-4575 SI<br>Related Cases: C 08-3137 SI, C 09-1437 SI<br><br>**ORDER GRANTING IN PART AND DENYING MOTIONS TO DISMISS COUNTERCLAIM; GRANTING LEAVE TO AMEND COUNTERCLAIM; GRANTING MOTION TO AMEND CAPTION** |

On January 23, 2009, the Court held a hearing on the City of Alameda and Stone & Youngberg's motions to dismiss the counterclaim of the Nuveen Funds and Pacific Specialty Insurance Company. After the hearing, the Nuveen Funds and Pacific filed a motion to amend the counterclaim, as well a proposed first amended counterclaim. The motion to amend the counterclaim, as well as an unopposed motion to amend the caption, are scheduled for a hearing on May 22, 2009. This order resolves all pending motions, and accordingly the Court VACATES the May 22, 2009 hearing.[1] The Court will hold a case management conference on June 5, 2009 at 2:30 pm.

**BACKGROUND**

This case arises out of the City of Alameda's 2004 sale of $33 million in municipal revenue bond

---

[1] In the interest of efficiency, the Court has analyzed the allegations of the proposed first amended counterclaim in connection with the motions to dismiss the counterclaim. As set forth in this order, the Court finds that the proposed first amended counterclaim generally meets the pleading requirements for securities fraud claims. This analysis does not preclude the City of Alameda or Stone & Youngberg from moving to dismiss the amended counterclaim once it is filed, provided such motions are based on grounds not addressed in this order.

anticipation notes ("Notes"). The Notes were issued to finance the construction of the City of Alameda's cable TV and internet system (the "Telecom System"). The sale was underwritten by Stone & Youngberg ("S&Y"), who sold the Notes to, among other purchasers, the Nuveen Funds and Pacific.[2] The proposed First Amended Counterclaim ("FAC") alleges that the Notes were issued pursuant to a fraudulent prospectus, and that the City and S&Y inflated projections in the prospectus to make the System appear as if it were economically feasible.

During the late 1990s, the City evaluated the feasibility of entering into the telecom business with the goal of financing what became a citywide hybrid fiber-coaxial telecom system. FAC ¶ 16. The City began operation of the Telecom System in July 2001. *Id*. The FAC alleges,

> 17. Alameda learned the following factors that severely limited the size of its potential subscriber base and otherwise limited its ability to generate revenues as a result of information it obtained in a series of surveys and reports between 1996 and mid 2003 and its experience operating the Telecom System between July 2001 and early 2004:
>
> a. Apartments and condominiums (also called multiple dwelling units or "MDUs") were over 40% of Alameda's potential subscriber base, but for reasons that are alleged in more detail below, Alameda had abandoned any serious attempt to market the System to apartment and condominium dwellers;
>
> b. Alameda was facing a competitive onslaught from satellite based systems that had, by June 2003, captured over 7.7% of the available subscriber base;
>
> c. Alameda learned that a large segment of the City's residents desired foreign language programming, but had failed to provide any significant foreign language programming;
>
> d. Alameda learned that providing cable telephone service would enhance its ability to attract customers and increase revenues but had failed to provide cable telephone service;
>
> e. Alameda learned that a substantial portion of its potential subscriber base received good to excellent line-of-sight reception for free and would be unlikely to subscribe to any cable television service; and
>
> f. Alameda's chief competitor had already captured about half the available market.
>
> These factors both individually and collectively imposed severe limitations on Alameda's potential reasonable subscriber base.

FAC ¶ 17(a)-(f). The FAC alleges that Alameda could not substantially raise its rates as a result of these

---

[2] Defendants and counterclaimants Nuveen Municipal High Income Opportunity Fund, the Nuveen Municipal Trust on behalf of its series Nuveen High Yield Municipal Bond Fund, and Pacific Specialty Insurance Company are referred to throughout as "the Nuveen Funds and Pacific."

limitations on the size of its potential customer base, and that Alameda had decided from the outset that it would be motivated by service rather than profit and was, as a result, unwilling to substantially raise prices to its customer base. *Id*. ¶ 18. Alameda had issued $16 million in debt to pay for the Telecom System; it was due to be repaid in May 2004, and if the City did not repay the debt the City would not only lose the Telecom System, but would also lose any chance of recovering the substantial funds it had invested in the system. *Id*. ¶ 19. Counterclaimants allege that by mid-2003, Alameda knew that the Telecom System was not economically feasible and would ultimately have to be sold for a substantial loss, but believed that loss could be reduced if it could complete the System and sign up more customers. *Id*. ¶ 21. "As part of an 'exit strategy,' Alameda decided to issue $33 million in Notes to repay the outstanding debt, provide additional funds for completion of the System, and pay certain costs associated with issuing the Notes." *Id*. ¶ 22. The Notes were to be repaid through the issuance of long term bonds in April 2009, based upon projections that indicated that the System could reasonably be expected to become profitable by 2007. *Id*. The FAC alleges that the only other security Alameda provided was a pledge of revenues generated by the System. *Id*.

The Notes were issued by the Alameda Public Financing Authority ("the Authority") pursuant to a prospectus called a Preliminary Official Statement (issued in March 2004) and an Official Statement (issued April 8, 2004), collectively referred to as the "Official Statements" or "OS." *Id*. ¶ 23. Alameda hired Stone & Youngberg to act as the underwriter for the Notes, and S&Y was the principal author of the Official Statements. *Id*. ¶ 24. The FAC alleges that "The Authority as the issuer and S &Y as the underwriter owed potential purchasers of the Notes, including the Nuveen Funds and Pacific, a duty to make full and fair disclosure of all material facts in the Official Statements." *Id*. ¶ 25.

Alameda also hired a telecommunications consultant, Uptown Services LLC ("Uptown"), to prepare a financial feasibility analysis of the Telecom System that was called a "Validation of Cable System Business Plan for Alameda Power & Telecom, Task 1 Report," and a "Validation of Cable System Business Plan for Alameda Power & Telecom, Task 2 Report," both of which were attached as appendices to the OS. The FAC alleges,

> 27. In June 2003 (after two full years of dismal operating performance) Alameda prepared a Telecommunications Marketing Plan that projected the System would ultimately capture a total of about 16,800 telecom and internet customers and projected

3

> revenues of about $7.6 million in 2008. That proved to be woefully insufficient to justify the issuance of the Notes.
>
> 28. To make the System appear to be economically feasible and to justify the issuance of the Notes, Alameda with the knowledge and consent of Stone & Youngberg, caused Uptown to fraudulently inflate revenue and market penetration projections far beyond what Alameda's actual operating experience indicated was reasonably achievable. Revenue projections were doubled from $7.6 million to over $15 million. Market penetration projections increased from 16,800 to over 22,000.
>
> 29. Uptown called the attention of Alameda and Stone & Youngberg to the fact that it had projected near flat operating expenses during a time period when it projected a tripling of the subscriber base and questioned "whether operating expenses could support a tripling of the subscriber base?"

*Id*. ¶¶ 27-29; *see also id*. ¶¶ 166-98.

The FAC alleges that programming costs were the largest and least controllable operating expense, and Uptown had projected programming expenses would increase at a rate of 4% per year (despite the projected tripling of the customer base) and projected that programming expenses would decline as a percent of revenues. *Id*. ¶ 30. The FAC alleges that despite these projections, Alameda believed that programming expenses would continue to increase at a rate substantially in excess of 4% per year. *Id*. ¶ 31. In addition, because of the factors that counterclaimants allege limited the potential reasonable subscriber base, Alameda "also knew that it was highly unlikely that programming expenses would decline as a percent of revenue." *Id*. According to the FAC, Alameda and S&Y discussed Uptown's statement that the increase in revenue projections was "world class" and Uptown's belief that the inflated projections "PUT PLAN AT RISK" but still decided to attach the inflated projections to the OS and proceeded with the issuance of the Notes in April 2004. *Id*. ¶ 32.

The FAC alleges that in the month preceding the issuance of the Notes, Alameda suffered double its usual rate of customer disconnects from the System because its chief competitor, Comcast, was increasing its efforts to drive the Telecom System out of business. *Id*. ¶ 33. Counterclaimants allege that Alameda's historic operations of the Telecom System were important because that experience demonstrated that the Telecom System was not economically viable. However, S&Y joined with Alameda in fraudulently representing to Note purchasers that historic operations of the Telecom System were not "relevant" to any decision to invest in the Notes. *Id*. ¶ 34.

After the issuance of the notes in 2004, the Telecom System did not perform as anticipated. In

4

mid-2006, the City hired a telecommunications consultant, CCG Consulting, to evaluate the system's operation and make recommendations for improvement. CCG issued its report in December 2006, making numerous suggestions for enhancing the system's financial performance, including the addition of voice services and implementing rate increases in certain areas. The City took steps to initiate some improvements in accordance with the report's proposals.

However, in early 2008, the City announced that the telecom system was not economically feasible and would have to be sold. *Id.* ¶ 37. The FAC alleges that "[t]o mitigate damages, the Nuveen Funds and Pacific agreed to Alameda's demand that the System be sold to AP&T's chief competitor, Comcast, for a $17 million. The System was sold to Comcast in November 2008 for $17 million (or about 50 cents on the dollar of the outstanding notes), leaving the Nuveen Funds and Pacific with collective realized out-of-pocket damages of at least $9,547,000." *Id.*[3]

On October 1, 2008, the City filed this action seeking declaratory relief against the Nuveen funds. The City seeks a declaration of the respective rights and duties of the City and the Note holders. On October 16, 2008, the Nuveen Funds and Pacific filed a counterclaim against the City, S&Y, and Uptown alleging violations of Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5; violations of Section 20(a) of the Securities Exchange Act of 1934; violations of California Corporations Code Sections 25400, 25401, 25500, 25501, and 25504.1; violations of the Illinois Securities Act; common law fraud; aiding and abetting in the commission of common law fraud; and negligent misrepresentation. On December 5, 2008, Uptown was dismissed without prejudice.

The City and S&Y moved to dismiss the counterclaims, and after those motions were submitted, the Nuveen Funds and Pacific sought leave to amend the counterclaim. According to the motion requesting leave to file the first amended counterclaim, the new allegations are based upon documents produced by the City of Alameda and Uptown, including marketing studies and reports, internal confidential emails between Alameda principals, Alameda business plans, Alameda internal budgets and proformas, handwritten notes made by Alameda principals, emails between Alameda, S&Y and Uptown

---

[3] The FAC also alleges that "[a]s a direct and proximate result of the Defendants' wrongful conduct, the Nuveen Funds and Pacific have collectively suffered damages in an amount which is presently unknown but is in excess of $11 million." *Id.* ¶ 339. It is not clear why the FAC alleges different damages amounts, but that discrepancy is irrelevant to analyzing the present motions.

5

For the Northern District of California

which "discuss fraudulently inflated revenue projections," and a June 2003 Alameda Marketing Plan. The proposed amended counterclaim contains the same claims as the original counterclaim, though the claims are organized somewhat differently.

**LEGAL STANDARD**

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. "In undertaking this review, we will accept the plaintiffs' allegations as true and construe them in the light most favorable to plaintiffs, and will hold a dismissal inappropriate unless the plaintiffs' complaint fails to state a claim to relief that s plausible on its face." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 989 (9th Cir. 2009) (internal citations and quotations omitted). "At the pleading stage, a complaint stating claims under Section 10(b) [of the Securities Exchange Act of 1934] and [SEC] Rule 10b-5 must satisfy the dual pleading requirements of Federal Rule of Civil Procedure 9(b) and the PSLRA." *Id.* at 990. After the PSLRA, a plaintiff must "plead with particularity both falsity and scienter." *Gompper v. VISX, Inc.*, 298 F.3d 893, 895 (9th Cir. 2002).

**DISCUSSION**

**I.    Motions to dismiss counterclaim and motion to file amended counterclaim**

    **A.    Section 10b-5**

Section 10(b) of the Securities Exchange Act of 1934 provides, in part, that it is unlawful "to use or employ in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b). SEC Rule 10b-5 makes it unlawful for any person to use interstate commerce:

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a

fraud or deceit upon any person, in connection with the purchase or sale of any security.
17 C.F.R. § 240.10b-5.

In order to state a claim under § 10(b) and Rule 10b-5, the plaintiff must allege "(1) a material misrepresentation or omission of fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss." *In re Daou Sys., Inc. Securities Litig.*, 411 F.3d 1006, 1014 (9th Cir. 2005).

### 1. Scienter

The City and S&Y contend that the 10b-5 claim fails because the counterclaim has not pled scienter. The Nuveen Funds and Pacific argue that they have met the PSLRA's heightened requirement to plead "in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct." *In re Silicon Graphics*, 183 F.3d at 974.

"[T]o adequately plead scienter, the complaint must [] 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Zucco Partners*, 552 F.3d at 991. The inquiry "is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights, Inc.,* 551 U.S. 308, 127 S. Ct. 2499, 2509 (2007) (emphasis in original). "[T]he inference of scienter must be more than merely 'reasonable' or 'permissible' – it must be cogent and compelling, thus strong in light of other explanations." *Id.* at 2510 (internal quotation marks omitted). "To adequately demonstrate that the defendant acted with the required state of mind, a complaint must allege that the defendants made false or misleading statements either intentionally or with deliberate recklessness." *Zucco Partners*, 552 F.3d at 991. The Ninth Circuit has instructed that "following *Tellabs*, we will conduct a dual inquiry: first, we will determine whether any of the plaintiff's allegations, standing alone, are sufficient to create a strong inference of scienter; second, if no individual allegations are sufficient, we will conduct a 'holistic' review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness." *Id.* at 992.

The Court concludes that the proposed amended counterclaim sufficiently alleges scienter. The

7

proposed amended counterclaim alleges a number of specific facts in support of the claim that by 2004, Alameda knew that the Telecom System was not economically feasible when the Notes were issued. The FAC pleads facts taken from numerous surveys, feasibility studies, reports, budgets and other documents showing that Alameda and S&Y knew about all of the material problems with the Telecom System. Significantly, the proposed amended counterclaim alleges that Alameda and S&Y concealed the fact that the system was not economically feasible from investors by causing Uptown to fraudulently inflate subscriber numbers and revenues in the projections contained in the feasibility study attached to the OS. The FAC alleges that in mid-2003 S&Y was provided with drafts of Uptown's feasibility study which did not project sufficient revenue to justify issuing the Notes, and that Alameda and S&Y directed Uptown to prepare new drafts including inflated revenue projections based on assumptions that had been proven false during the three year prior operating history of the Telecom System. FAC ¶¶ 166-99. The FAC alleges that Uptown sent an email inquiry to S&Y on August 18, 2003, questioning the reasonableness of the assumptions used in the feasibility study and the reliability of its own projections, and that S&Y also received a meeting agenda where Alameda itself questioned the reasonableness of Uptown's assumptions. *Id*. ¶¶ 194-97. The FAC alleges that despite these concerns, Uptown's inflated projections were not changed and instead were attached to the OS – the OS which stated that "no historic presentation of operations would be relevant to any decision to invest in the notes." *Id*. ¶ 98; OS at 20. These allegations, taken collectively, establish a strong inference of scienter.

### 2. **Publicly available information**

The City and S&Y also contend that the counterclaim's reliance on concealment of facts repeatedly disclosed at open public meetings and in publicly available reports negates several elements of the Rule 10b-5 claim. With regard to the City Council meetings, the City and S&Y argue that those meetings were open to and attended by the public, spanned a period of four months immediately preceding issuance of the notes in April 2004, and the meetings were attended and reported on by members of the Bay Area press. The City asserts that detailed written minutes of the meetings were kept and made part of the City's public records, available on the internet and to anyone upon request. *See* Request for Judicial Notice in Support of Reply, Ex. A-D (Minutes for City Council meetings of Oct.

8

21, 2003, Nov. 24, 2003, Dec. 16, 2003, & Feb. 17, 2004).[4] The City argues that public disclosure of allegedly withheld information is fundamentally inconsistent with an intent to defraud. Similarly, the City and S&Y argue that industry, academic and government reports cited in the counterclaim would readily have been available to any investor choosing to investigate the facts, particularly a large and sophisticated investor such as Nuveen.

The Court concludes that the impact of publicly available information is a fact issue that is inappropriate for resolution on the pleadings. Whether the City Council meeting minutes were in fact posted on the City's website prior to the time the Notes were purchased is a factual question that cannot be resolved at this stage of the litigation. Even if the minutes were posted on the website prior to the purchase, there is a question about whether this information was "reasonably available to investors." *Dolphin & Bradbury Inc. v. S.E.C.*, 512 F.3d 634, 641 (D.C. Cir. 2008) (affirming SEC order holding underwriter for municipal bond offering liable for securities violations in connection with failure to disclose material information that was "technically in the public domain, partly due to a local newspaper article and a discussion at a public DCGA meeting" but "not reasonably available to investors"). Similarly, the arguments about Nuveen's relative sophistication as an investor are misplaced in a motion to dismiss. The Court cannot conclude that under the facts alleged in the FAC, the publicly available information can be imputed to the Nuveen Funds and Pacific as a matter of law.

### 3. Disclosures in the OS

The City and S&Y also argue that the counterclaim fails because much of the allegedly omitted information was actually disclosed in the Official Statement, and thus the counterclaim does not plead material misrepresentations or omissions. They argue that the Official Statement contained specific disclosures about programming costs, past cost overruns, rate increases, and competition from satellite and other cable providers. Relatedly, the City also invokes the "bespeaks caution" doctrine, which

---

[4] The Court takes judicial notice of the existence of the minutes. However, the Court makes no finding as to whether those minutes were available on the City's website by April 2004. The Court does not take judicial notice of the documents submitted by the City regarding the Nuveen Funds, and in support of the City's argument that the Nuveen Funds are a "sophisticated investor." The City notes that its arguments about Nuveen's "sophistication" are based on Nuveen's own description of itself. Regardless, the Court finds that these factual matters are misplaced at this stage of the litigation.

9

provides a mechanism by which a court as a matter of law may determine that a defendant's forward-looking representations contain enough cautionary language or risk disclosure to protect the defendant against claims of securities fraud. *See Provenz v. Miller*, 102 F.3d 1478, 1487 (9th Cir. 1996). This doctrine provides that the forward-looking statements must be analyzed "in context," must "be precise," and must "directly address [ ] . . . the [defendant's] future projections." *See id*. at 1493. In response, counterclaimants contend that the disclosures and warnings about the possible future risks in the Official Statement were misleading because they did not disclose material facts demonstrating that the City and S&Y knew Telecom System was not economically viable.

The Court cannot conclude as a matter of law that the disclosures contained in the Official Statement bar the securities fraud claims. The FAC alleges that when the Notes were issued, the City and S&Y already knew that the Telecom System was not economically feasible, and that they knowingly included Uptown's inflated projections in the Official Statement to make it appear that the System could be viable. Under those facts, which the Court must take as true for purposes of analyzing the present motions, the disclosures and warnings do not insulate the City and S&Y because the statements "create an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosp. Corp.*, 280 F.3d 997, 1005-06 (9th Cir. 2002). For the same reasons, the Court finds that the FAC sufficiently pleads materiality of the alleged omissions and misstatements. *See also In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1405 (9th Cir. 1996) ("The 'materiality' of an omission is a fact-specific determination that should ordinarily be assessed by a jury [and] [O]nly if the adequacy of the disclosure or the materiality of the statement is so obvious that reasonable minds could not differ are these issues appropriately resolved as a matter of law.").

#### 4. Loss causation

S&Y contends that the Section 10(b) claim must be dismissed against S&Y because counterclaimants have not alleged that any act by S&Y caused them any economic harm. S&Y argues that because the counterclaim alleges that the Notes' maturity date is June 2009, it can only predict that the Nuveen Funds and Pacific will suffer a loss at some time in the future. S&Y also contends that the counterclaim does not allege any causal connection between S&Y's alleged misrepresentations or

omissions and any alleged harm.

"[T]o prove loss causation, the plaintiff must demonstrate a causal connection between the deceptive acts that form the basis for the claim of securities fraud and the injury suffered by the plaintiff." *In re Daou Sys., Inc.,* 411 F.3d 1006, 1025 (9th Cir. 2005) (citing *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346 (2005)). "A complaint fails to allege loss causation if it does not 'provide[ ] [a defendant] with notice of what the relevant economic loss might be or of what the causal connection might be between that loss and the misrepresentation[.]'" *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1062 (9th Cir. 2008) (quoting *Dura*, 544 U.S. at 347).

The proposed amended counterclaim alleges that the System was sold to Comcast on November 12, 2009 for roughly 52 cents on the dollar, leaving the Nuveen Funds and Pacific with "damages in an amount which is presently unknown but is in excess of $11 million." FAC ¶¶ 334, 338-39. These allegations, combined with the allegations that the Notes were not worth what the City and S&Y represented they were worth – and what the Funds paid for them – "plausibly establish loss causation [such that] a Rule 12(b)(6) dismissal is inappropriate." *In re Gilead Sciences Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008).

### 5. Statute of limitations

The City and S&Y contend that the Rule 10b-5 claim is time-barred because the Nuveen Funds and Pacific were on inquiry notice of their claims from the moment they made their investments in 2004 and 2005. The City and S&Y argue that the Nuveen Funds and Pacific are sophisticated investors who have a duty to obtain available information, and that by their own allegations, the claims all arise out of information that was publicly available prior to their investments.

A Rule 10b-5 claim must be brought "within two years of discovery of the facts constituting the violation." *In re American Funds Sec. Litig.*, 556 F. Supp. 2d 1100, 1105 (C.D. Cal. 2008). Either actual or inquiry notice can start the running of the statute of limitations on a federal securities fraud claim.

The Court finds that the arguments about timeliness are premature and cannot be resolved on

the pleadings. "The question of whether the plaintiff exercised reasonable diligence in investigating the facts underlying the alleged fraud . . . necessarily entails an assessment of the plaintiff's particular circumstances from the perspective of a reasonable investor." *Id.* The FAC alleges that the Nuveen Funds and Pacific "exercised reasonable care and did not discover that they had been misled until 2008." FAC at p. 74 & ¶¶ 291-332. As discussed above, the sophistication of the Nuveen Funds and Pacific is a factual matter that is not appropriate for consideration on the pleadings. In addition, there are a number of factual questions regarding the extent to which information such as the City Council meeting minutes was publicly available. The City and S&Y may renew these arguments upon a fuller factual record.

### B. Section 20(a) claim

The City moves to dismiss the Nuveen Funds and Pacific's claim under Section 20(a) of the Securities Exchange Act on the ground that this claim rises and falls with the Rule 10b-5 claim. For the reasons stated above, the Court finds that counterclaimants have stated a claim under Rule 10b-5, and thus DENIES the motion to dismiss this claim.

### C. California Corporate Securities Act

The Nuveen Funds and Pacific allege that the City and S&Y have violated Sections 25400, 25401, 25500, 25501 and 25504.1 of the California Corporate Securities Act. The counterclaim alleges all of these violations under the Third Claim for Relief, while the proposed first amended counterclaim alleges the claims separately, with Sections 25400 and 25500 under the Third Claim for Relief, Sections 25401 and 25501 under the Fourth Claim for Relief, and Section 25504.1 under the Fifth Claim for Relief.

As an initial matter, the City moves to dismiss all claims under the Corporate Securities Act because the counterclaim does not plead compliance with the California Government Code claims presentation requirement, Cal. Gov't Code § 905. It is unclear whether the City has abandoned this contention, as the City's reply makes no mention of this argument. In any event, the proposed amended counterclaim pleads that in the Nuveen Funds gave the City notice of their intent to assert fraud and

negligence based claims against Alameda, and that the parties engaged in unsuccessful formal mediation in August 2008. FAC ¶¶ 335-36. In addition, the City initiated this declaratory relief action, and under such circumstances, the purposes of the claim presentment requirement have been satisfied. *See People ex rel. Dep't of Parks & Recreation v. West-A-Rama, Inc.*, 35 Cal. App. 3d 786, 794 (1973) (waiving compliance with claims statutes where the "State presumably made a full investigation of the respective rights and duties of the parties before initiating this suit on the concession agreement. Presumably, it has already made the decision that the claim should not be settled, since State itself decided to litigate."); *see also Krainock v. Superior Court*, 216 Cal. App. 3d 1473, 1477-79 (1990).

### 1. Cal. Corp. Code §§ 25400, 25500

California Corporations Code Section 25500 states: "Any person who willfully participates in any act or transaction in violation of Section 25400 shall be liable to any other person who purchases or sells any security at a price which was affected by such act or transaction." Cal. Corp. Code § 25500. Section 25400 provides:

It is unlawful for any person, directly or indirectly, in this state:

(a) For the purpose of creating a false or misleading appearance of active trading in any security or a false or misleading appearance with respect to the market for any security, (1) to effect any transaction in a security which involves no change in the beneficial ownership thereof, or (2) to enter an order or orders for the purchase of any security with the knowledge that an order or orders of substantially the same size, at substantially the same time and at substantially the same price, for the sale of any such security, has been or will be entered by or for the same or different parties, or (3) to enter an order or orders for the sale of any security with the knowledge that an order or orders of substantially the same size, at substantially the same time and at substantially the same price, for the purchase of any such security, has been or will be entered by or for the same or different parties.

(b) To effect, alone or with one or more other persons, a series of transactions in any security creating actual or apparent active trading in such security or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others.

(c) If such person is a broker-dealer or other person selling or offering for sale or purchasing or offering to purchase the security, to induce the purchase or sale of any security by the circulation or dissemination of information to the effect that the price of any such security will or is likely to rise or fall because of market operations of any one or more persons conducted for the purpose of raising or depressing the price of such security.

(d) If such person is a broker-dealer or other person selling or offering for sale or

13

> purchasing or offering to purchase the security, to make, for the purpose of inducing the purchase or sale of such security by others, any statement which was, at the time and in the light of the circumstances under which it was made, false or misleading with respect to any material fact, or which omitted to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, and which he knew or had reasonable ground to believe was so false or misleading.
>
> (e) For a consideration, received directly or indirectly from a broker-dealer or other person selling or offering for sale or purchasing or offering to purchase the security, to induce the purchase or sale of any security by the circulation or dissemination of information to the effect that the price of such security will or is likely to rise or fall because of the market operations of any one or more persons conducted for the purpose of raising or depressing the price of such security.

Cal. Corp. Code § 25400.

The City moves to dismiss this claim on the ground that the counterclaim does not allege that the price the Funds paid for the Notes "was affected by" any alleged misconduct. In response, counterclaimants argue that "the price the Funds paid for the Notes (CC ¶¶ 23 and 97-100) was obviously 'affected' by the fraud since the fraud concealed the fact that the System was not economically feasible." Opposition at 37:7-8. However, neither the counterclaim nor the proposed amended counterclaim actually alleges that the price of the Notes was affected by the City's and S&Y's alleged misconduct. Because Section 25500 requires that the price be "affected" by an act or transaction prohibited by Section 25400, the Court will GRANT the Nuveen Funds and Pacific leave to amend to add this allegation.

The City also contends that the price of the Notes could not, in fact, have been affected since "Nuveen set the market price" and there was no "market" for the Notes. To the extent City contends that, as a matter of law, Section 25500 requires a securities sale on the open market, this argument fails. *See StorMedia, Inc. v. Superior Court*, 20 Cal. 4th 449, 458 (1999) (Section 25500 "does not provide expressly or by implication that there must be an offer for, or a sale or purchase of a security on, the open market. If this construction of the statutory language were adopted, a seller would not be liable for market manipulation that affected the price of the stock no matter how many persons were affected if he or she took advantage of the resulting artificial market through a private sale."). To the extent the City argues that the price was not, in fact, manipulated because "Nuveen set the market price," this is a factual contention inappropriate for resolution on the pleadings.

14

The City and S&Y also move to dismiss the claims under Sections 25400 and 25500 for failure to adequately plead "willful" participation. For the reasons set forth above, because the proposed amended counterclaim sufficiently pleads scienter, the Court concludes that the Nuveen Funds and Pacific have also alleged "willful" participation.

### 2. Cal. Corp. Code §§ 25401, 25501, § 255404.1[5]

The Nuveen Funds and Pacific have alleged claims under California Corporations Code Sections 25401, 25501, and 255404.1. California Corporations Code Section 25401 states:

> It is unlawful for any person to offer or sell a security in this state or buy or offer to buy a security in this state by means of any written or oral communication which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

Cal. Corp. Code § 25401. Section 25501 provides a private right of action for violations of Section 25401: "Any person who violates Section 25401 shall be liable to the person who purchases a security from him or sells a security to him, who may sue either for rescission or for damages . . . ." Cal. Corp. Code § 25501. Section 25504.1 provides:

> Any person who materially assists in any violation of Section 25110, 25120, 25130, 25133, or 25401, or a condition of qualification under Chapter 2 (commencing with Section 25110) of Part 2 of this division imposed pursuant to Section 25141, or a condition of qualification under Chapter 3 (commencing with Section 25120) of Part 2 of this division imposed pursuant to Section 25141, or an order suspending trading issued pursuant to Section 25219, with intent to deceive or defraud, is jointly and severally liable with any other person liable under this chapter for such violation.

Cal. Corp. Code § 25504.1.

S&Y moves to dismiss these claims for failure to properly allege willful intent. For the reasons set forth above, the Court concludes that the proposed amended counterclaim sufficiently pleads willful intent, and accordingly DENIES S &Y's motion.

The City moves to dismiss these claims for lack of privity because the Nuveen Funds and Pacific purchased the Notes from S&Y, and not from the City. In response, the Nuveen Funds and Pacific

---

[5] As noted above, the counterclaim alleges all violations of the California Corporate Securities Act under the Third Claim for Relief. The proposed first amended counterclaim alleges violations of Sections 25401 and 25501 under the Fourth Claim for Relief, and a violation of Section 25504.1 under the Fifth Claim for Relief.

15

1  contend that strict privity is not required under Section 25504.1, which imposes joint and several
2  liability on those who "materially assist" in a violation of Section 25401.

3  The Court concludes that strict privity is required for a claim under Section 25501 (and thus
4  25401), but not under Section 25504.1. In *S.E.C. v. Seaboard Corp.*, 677 F.2d 1289 (9th Cir. 1982), the
5  Ninth Circuit held that Section 25401 required actual privity, and affirmed a dismissal of a Section
6  25401 claim against an attorney who had acted as an agent for a corporation, Oceanography, in
7  connection with another company's purchase of Oceanography stock. *Id.* at 1296. However, the court
8  noted that "Section 25504.1, added by the statutes of 1977, provides for liability of any person who
9  materially assists in a violation of Section 25401. Because this section was not in force at the time of
10 the sale, it cannot subject Jones to liability here." *Id*. at 1296 n.7. Thus, *Seaboard* suggests that parties
11 not in direct privity with the plaintiff can nevertheless be held liable under Section 25504.1 if they
12 "materially assist" in a violation of Section 25401. *See also In re ZZZZ Best Securities Litig.*, CV
13 87-3574 RSWL, 1990 WL 132715, at *17-18 (C.D. Cal. July 23, 1990).

14 Accordingly, the Court GRANTS the City's motion to dismiss the claims under Sections 25401
15 and 25501 without leave to amend, and DENIES the City's motion to dismiss the Section 25504 claim.

### D.  Illinois Securities Act

18 The counterclaim alleges a claim under the Illinois Securities Act, 815 Ill. Comp. Stat. 5/12 and
19 5/13 (2006). S&Y moves to dismiss this claim on the ground that Nuveen has not adequately alleged
20 that the Notes were purchased and sold in Illinois such that the Illinois Securities Act applies to their
21 allegations. *See McBreen v. Iceco, Inc.*, 12 Ill. App. 2d 372, 377 (1956) ("There is no right of action
22 under the [Illinois Security] statute unless the sale complained of took place in Illinois."). Whatever
23 deficiencies may have existed in the original counterclaim, the FAC now alleges that "[t]he orders for
24 the above alleged purchases of the Notes were made from Illinois, the Note purchases were paid for
25 from Illinois and the Notes are held by the Nuveen Funds and Pacific in Illinois." FAC ¶ 290. The
26 Court finds this allegation is sufficient to invoke the Illinois Securities Act, and accordingly DENIES
27 S&Y's motion on this ground.

28 The City moves to dismiss this claim on the ground that Nuveen and Pacific were not in privity

16

with the City, and thus the City has no nexus with Illinois. Neither party has cited authority addressing whether the issuer of a note that is sold through an underwriter in Illinois can be held liable under the Illinois Securities Statute. Both parties rely on *Gottlieb v. Vaicek*, 69 F.R.D. 672 (N.D. Ill. 1975). That case noted, in the context of evaluating whether a non-party should be joined, that in a related California state action, the non-party California resident had to allege that she was in privity with her son Gottlieb, an Illinois resident who had acted as her agent in a financial transaction, in order to bring a claim under the Illinois Securities Act. That case does not shed any light on whether, under the facts alleged here, the City of Alameda may be named as a defendant under the Illinois Securities Statute. The FAC alleges violations of 815 Ill. Comp. Stat. 5/12 (F), (G) and (I). It is not obvious from the language of these provisions that the City must have directly sold the Notes to Nuveen and Pacific in order to state a claim. *See, e.g.*, 815 Ill. Comp. Stat. 5/12 (G) ("To obtain money or property through the sale of securities by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."); (H) ("To employ any device, scheme or artifice to defraud in connection with the sale or purchase of any security, directly or indirectly."). If the City again moves to dismiss this claim, the parties are directed to address this issue in the briefing.

### E. Common law claims against S &Y

The Nuveen Funds and Pacific allege claims for common law fraud, aiding and abetting fraud, and negligence against S&Y. S&Y moves to dismiss these claims on statute of limitations grounds as well as failure to plead fraud and misrepresentation with particularity. For the reasons stated above, the Court concludes that the counterclaim sufficiently alleges material misrepresentations and omissions as well as S &Y's scienter. S&Y may renew its statute of limitations arguments on a fuller factual record.

## II. Motion to amend caption

Defendants/counterclaims Nuveen Funds and Pacific have filed an unopposed motion to amend the caption. The motion is GRANTED.

17

## CONCLUSION

For the foregoing reasons, the Court GRANTS in part and DENIES in part the motions to dismiss the counterclaim, GRANTS the motion for leave to file an amended counterclaim, and GRANTS the motion to amend the caption. (Docket Nos. 25, 31, 66 & 67). The Nuveen Funds and Pacific shall file an amended counterclaim by **June 1, 2009**.

**IT IS SO ORDERED.**

Dated: May 20, 2009

SUSAN ILLSTON
United States District Judge